# Illinois Official Reports

## Appellate Court

---

### *People v. Zimmerman*, 2018 IL App (4th) 170695

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. KIRK ZIMMERMAN, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket Nos. 4-17-0695, 4-17-0696 cons. |
| Filed | June 18, 2018 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 15-CF-894; the Hon. Scott Drazewski, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Jason Chambers, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and David E. Mannchen, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>John P. Rogers, of Rogers, Sevastianos & Bante, LLP, of Clayton, Missouri, for appellee. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Holder White and Knecht concurred in the judgment and opinion. |

**OPINION**

¶ 1       In July 2015, a grand jury indicted defendant, Kirk Zimmerman, for the first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) of defendant's ex-wife, Pamela Zimmerman. The State later filed two motions *in limine* that sought to (1) introduce identification testimony pursuant to section 115-12 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-12 (West 2016)) and Illinois Rule of Evidence 801(d)(1) (eff. Oct. 15, 2015) and (2) introduce statements by Pamela under the doctrine of forfeiture by wrongdoing. See Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011). Defendant subsequently filed his own motions *in limine* to exclude the same evidence the State sought to introduce.

¶ 2       The trial court first took up the identification testimony and conducted a hearing over multiple days in March and April 2017, at which several witnesses testified. Following the hearing, the court granted the State's motion in part, ruling that only one of the State's witnesses could testify as to a prior identification.

¶ 3       Over five days in May 2017, the trial court conducted a hearing, at which several witnesses testified on the issue of forfeiture by wrongdoing. In July 2017, the court issued a written order finding defendant killed Pamela with the intention of preventing her from testifying. However, the court deemed only two oral statements and one set of documents admissible pursuant to the forfeiture by wrongdoing doctrine. The court excluded all other proposed statements because they were "not probative of any material fact; irrelevant; speculative; remote; improper lay opinion; lack[ed] *** personal knowledge; cumulative; improper character evidence; and/or the probative value of the evidence [was] substantially outweighed by its prejudicial effect." Despite so ruling, the court noted the State could still seek to introduce the evidence at trial.

¶ 4       In August 2017, the State filed two motions to reconsider each of the trial court's rulings. The State argued the court applied the wrong standards in evaluating the evidence and unduly restricted the State's ability to present its case. Alternatively, the State requested the court explain with specificity why the court believed certain statements were inadmissible so the State could address the court's concerns before again seeking the statements' admission at trial. The State also explained that it wished to properly structure its case so as to prevent an inadvertent violation of the order *in limine* and a mistrial. The court denied the motions to reconsider. The State filed an interlocutory appeal.

¶ 5       The State appeals, arguing that the trial court erred by (1) granting its motions *in limine* only in part and (2) deeming inadmissible certain prior identification testimony and certain statements under the doctrine of forfeiture by wrongdoing. We disagree and affirm.

## I. BACKGROUND

¶ 6

¶ 7       The following testimony and documentary evidence were presented to the trial court at the hearings on the motions *in limine*.

### A. The Underlying Murder and Initial Investigation

¶ 8

¶ 9       Sometime on the evening of November 3, 2014, defendant's ex-wife, Pamela Zimmerman, was murdered in her office in an area of Bloomington, Illinois, commonly known as Doctors Park. On November 4, 2014, at approximately 7:30 a.m., her body was discovered by Ina Hess, Pamela's secretary. Pamela had been shot multiple times, including once in the head.

Investigators did not discover anything of significant value missing from the office. Pamela's wallet was eventually located several streets from the office in a ditch, but the wallet contained cash and all of her credit cards. Her cellular phone was also found several streets away.

¶ 10 Later that day, investigators approached defendant at State Farm Insurance Company where he worked and, after informing him of Pamela's death, asked him to come to the police station for an interview. He complied, and the police interviewed him for approximately six hours but ultimately released him. The police interviewed him several times in the following days but did not arrest him for the murder. The investigation continued for several months. In July 2015, a grand jury indicted defendant for first degree murder.

¶ 11 B. The Identification Testimony Motions and Proceedings

¶ 12 1. *Defendant's Motion to Suppress*

¶ 13 In September 2016, defendant filed a motion to suppress identification. Although the trial court ultimately granted that motion in part, that ruling is not at issue in this appeal. Nonetheless, the testimony presented at the hearing on that motion is pertinent to this appeal.

¶ 14 Defendant sought to suppress the identification of defendant by Mrs. Maria Legg. Defendant argued the photo lineup at which Mrs. Legg identified defendant was impermissibly suggestive. Defendant further contended Mrs. Legg's testimony was inherently unreliable.

¶ 15 The trial court conducted a hearing on the motion on three separate days in March and April 2017. Bloomington Detective Tim Power testified about the police investigation of the death of Pamela Zimmerman. Power stated the police received an anonymous tip in March 2016 that someone may have seen defendant at the scene of the crime on the night of the murder. The tip led police to Ron and Annis Guenther, who informed them about a meeting they had with Maria and Charles Legg at a Hardee's restaurant in the fall of 2015. During that meeting, Mrs. Legg informed them she had seen defendant in the Doctors Park parking lot on November 3, 2014, and recognized him when his picture was printed in the newspaper following his July 2015 arrest.

¶ 16 Later in March 2016, Power interviewed the Leggs in their home and administered a photo lineup via a computer program. Both the interview and the lineup were recorded and reviewed by the court. During the interview, Mrs. Legg described (1) what she saw on November 3, 2014, (2) her identification of defendant as the man she saw on that night from a picture in the newspaper, and (3) her conversation with the Guenthers and her husband at the Hardee's regarding both of these events. Power testified that following the interview, Mrs. Legg viewed a photo lineup and indicated she believed the first photo was the man she saw. The first photo was defendant and was the same photo published in the local newspaper on numerous occasions.

¶ 17 Mrs. Legg testified she was dropping off recycling at St. Luke Union Church around 6 p.m. on November 3, 2014. The church shares a parking lot with Doctors Park. Mrs. Legg testified she saw a man exiting the rear of what was later identified as Pamela's office. The man was tightly holding a black garbage bag and stared directly at her. Mrs. Legg stated she was scared because she was alone, but she looked right at the man. The parking lot was well-lit, and the man eventually walked in her direction, but before reaching her, he stopped at a car parked under a light post. He put the garbage bag in the car's trunk before getting in the car. As Mrs. Legg then exited the parking lot, she drove past the man as he sat in his car. The next day, she

saw in the newspaper that a murder occurred in Doctors Park. She called her husband, who was out of town, and told him what had happened. She asked him if she should talk to the police. Her husband said she should not because the man might come after them.

¶ 18    Months later, Mrs. Legg saw a photo of defendant in the newspaper and recognized him as the man she saw on the night of the murder. (The trial court took judicial notice of the fact that the first time defendant's picture was published in the newspaper was July 22, 2015.)

¶ 19    Mrs. Legg further testified that sometime thereafter, she and her husband met the Guenthers at a fast-food restaurant, and she informed both of them about what she saw on the night of the murder. She also told them she subsequently identified defendant as the man she saw from his photo in the newspaper. Mrs. Legg also testified about the police interview and photo lineup. Additionally, Mrs. Legg made an in-court identification of defendant.

¶ 20    Annis Guenther testified she and her husband sometimes met the Leggs at a Hardee's. They did not socialize with the Leggs outside of that setting. Mrs. Guenther testified that on one particular occasion, likely in the fall of 2015, Mrs. Legg was very upset and told them what she had seen on November 3, 2014. Mrs. Legg also told them about recognizing defendant after seeing his picture in the newspaper. Mrs. Guenther stated she did not tell the police but did share the information with others.

¶ 21    Charles Legg testified that in early November 2014, his wife called him upset because she had seen a strange man while dropping off recycling at St. Luke Union Church. He added that she later recognized the man when his picture was published in the newspaper. Mr. Legg also testified about seeing the Guenthers at Hardee's and that his wife informed them of her experiences.

¶ 22    After the hearing, the trial court ruled Mrs. Legg's identification of defendant from the photo lineup was inadmissible because it was impermissibly suggestive. However, the court found Mrs. Legg had a sufficient independent recollection to render her in-court identification admissible.

¶ 23    2. *The State's Motion* in Limine *to Admit Statements of Identification*

¶ 24    In May 2017, the State filed a motion *in limine* to admit statements of identification pursuant to section 115-12 of the Code (725 ILCS 5/115-12 (West 2016)) and Illinois Rule of Evidence 801(d)(1)(B) (eff. Oct. 15, 2015). The State sought a ruling that testimony at the hearing on the motion to suppress identification from Charles Legg, Annis Guenther, and Ron Guenther that Maria Legg identified defendant as the man she saw on November 3, 2014, was admissible. The State argued that testimony from Charles Legg that Mrs. Legg identified defendant upon seeing him in the newspaper and her later recitation of this event to the Guenthers both constituted statements of identification and were therefore admissible.

¶ 25    Defendant filed a response, arguing the proposed witnesses lacked "personal knowledge of the circumstances of *** identification," and were merely informed of the identification after the fact. Accordingly, defendant argued, the testimony would be cumulative, unhelpful, and constitute improper bolstering.

¶ 26    In August 2017, the trial court ruled that Charles Legg could testify as to the identification made by Mrs. Legg when she saw defendant's photo in the newspaper, but the Guenthers could not testify regarding the conversation at Hardee's. The court indicated that it found the Guenthers "were merely individuals who would be able to repeat what someone said[,]" and

their testimony would merely be repetitive of Mr. and Mrs. Leggs' testimony. The court described a hypothetical in which Mrs. Legg recounted her identification to a crowded theater and explained that the State could not call all those witnesses to testify to the same event because it would be cumulative. Because the court concluded that the Guenthers' testimony would not be helpful to the trier of fact in deciding what weight to give the statements of prior identification, the court excluded that testimony.

### C. The Forfeiture by Wrongdoing Motions and Proceedings

#### 1. *The Motions* in Limine

In March 2017, the State filed a motion *in limine* to admit certain hearsay statements of Pamela pursuant to the common-law doctrine of forfeiture by wrongdoing and Rule of Evidence 804(b)(5). The State later filed several additional motions that added additional statements for admission on the same grounds.

In total, the State sought to introduce more than 40 statements from 16 witnesses and approximately 20 pages of documents. The proposed statements were from as far back as 2010 and as recent as the day of the murder.

In its motions, the State listed each specific statement to which it anticipated each witness would testify. Most of the statements dealt with the relationship between Pamela and defendant, particularly their 2012 divorce, 2013 child support enforcement proceedings, and anticipated enforcement proceedings in 2014. Others dealt with Pamela's fear or suspicion of defendant and what he might do to her over money, his retirement, and her recent engagement. The statements will be discussed only as necessary.

Defendant filed a written response to the State's motion, and the State subsequently amended its motion and filed a written response to defendant's response. On July 5, 2017, after the trial court had conducted evidentiary hearings, the State filed written arguments in support of its motion.

On July 10, 2017, defendant filed a motion *in limine* to exclude the State's proposed statements. Defendant argued that the State failed to meet its burden that he murdered Pamela with the intent of preventing her from testifying at a future proceeding. Defendant additionally asserted that even if forfeiture by wrongdoing applied, the statements were still inadmissible because they were irrelevant, speculative, remote, and substantially more prejudicial than probative.

#### 2. *The Forfeiture by Wrongdoing Testimony*

Over five days in May 2017, the trial court heard testimony on the State's motion *in limine* in order to determine if (1) defendant murdered Pamela and (2) he did so with the intent to make her unavailable as a witness. See Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011). The court took judicial notice of the identification testimony and evidence submitted at prior hearings in this case as well as the records in the McLean County divorce case between Pamela and defendant. The parties stipulated to the admission of numerous exhibits, including crime scene and investigation photographs, autopsy reports, gunshot residue reports, cell phone records, witness interview recordings (including defendant's prior interviews), and various other documents.

¶ 36     At the hearing, the State's theory was that defendant killed Pamela, in part, because she had recently decided to take him back to court to recover his half of certain child care expenses, and her doing so would interfere with defendant's ability to retire as scheduled. The evidence presented showed Pamela sent defendant a letter in October 2014, explaining that he owed $4000 in child care expenses and warning that if he did not pay, she would institute legal proceedings to recover the money. The letter included a spreadsheet itemizing the expenses. Other evidence showed the letter was sent via FedEx, and defendant signed for it in late October. In his interview with police the day after the murder, defendant discussed a FedEx document with police while describing his relationship with his ex-wife and their financial disagreements.

¶ 37     The State presented extensive testimony from Pamela's friends, neighbors, and clients as to particular statements Pamela made. Several friends testified that during and after the divorce, Pamela had said various versions of the following statement: "[i]f anything happens to me, Kirk did it." Others testified that Pamela had expressed concern over how defendant would react when he found out she had gotten engaged. The evidence showed she got engaged just a few days before she was killed. Still others testified as to statements made by Pamela before, during, and after the divorce concerning her fear of what defendant might do to her and statements made by defendant to Pamela about the divorce and child support.

¶ 38     Kathleen Kraft testified extensively concerning the 2012 divorce proceedings and the 2013 enforcement proceedings. Kraft testified she was Pamela's attorney during this time period and explained that defendant's pension was an overriding issue in the divorce proceedings and something she discussed frequently with Pamela. Pamela repeatedly stated that defendant wanted to retire at age 55, and if she interfered with that, she was afraid of what he might do to her. Kraft advised Pamela she was entitled to half of defendant's pension, but following mediation, the parties agreed defendant would keep 100% of his pension.

¶ 39     Kraft testified that she initiated enforcement proceedings in early 2013 against defendant at Pamela's request when defendant was not paying his share of child support. Pamela again expressed concern and fear about what defendant would do to her if enforcement proceedings interfered with his retirement. The trial court in those proceedings eventually found defendant in contempt and garnished his wages.

¶ 40     Kraft stated she spoke with Pamela in the fall of 2014, when Pamela advised her that defendant was again not paying his share of child support. Kraft advised her to send him a letter demanding payment and suggested if he did not comply, they would start enforcement proceedings again. On November 3, 2014, Pamela called Kraft and said she sent defendant the letter, he had not responded, she wished to start enforcement proceedings, and she wanted to know how much the retainer would be.

¶ 41     Marla Knuckey testified she considered Pamela to be one of her best friends. The two met while their daughters were in volleyball together and frequently saw each other at games and tournaments. Sometime after the divorce at one of those games, Pamela told Knuckey that defendant was angry because the two were going back to court over child support. Pamela stated that defendant said he should not have to pay the amount she was seeking because she made more money than he did. Pamela also reported to Knuckey that defendant told her she was ruining his life with these proceedings because he was not going to be able to retire. According to Knuckey's testimony, defendant said "he thought that [Pamela] was going to,

basically, use up all of his retirement money if he had to pay for all of this and he would not be able to retire."

¶ 42    Knuckey testified that in the fall of 2014, a few weeks before Pamela died, Pamela indicated she was worried about how defendant would react when he found out she was engaged. Knuckey could not remember the setting of this conversation, but she testified that in October 2014 she attended a Big 12 Conference volleyball tournament in Champaign with Pamela. At that time, Pamela indicated she and defendant had gotten into an argument, but Knuckey could not remember any specifics. Knuckey did recall that Pamela told her at that time that "[i]f anything happens to me, you know who did it," referring to defendant.

¶ 43    During Knuckey's testimony, defendant frequently objected to her representations of Pamela's statements because he believed she was paraphrasing and that the testimony was "speculative." The State replied that reliability was not an issue with respect to statements under the forfeiture by wrongdoing doctrine. The court admonished Knuckey that " 'I believe' doesn't cut it," and to be as specific as possible to the best of her recollection.

¶ 44    Throughout the hearing, a pattern emerged. Witnesses would testify as to statements they remembered, defendant would object and argue the statements were speculative, and, occasionally, the court would admonish the witness to be as specific as possible. Eventually, the witnesses were asked by the State and the court to testify as to Pamela's exact statements in the first person.

¶ 45    The State also presented evidence that a car similar to defendant's vehicle could be seen on surveillance camera footage in the parking lot of Pamela's office complex on the day of the murder. A forensic report showed gunshot residue was present on the gearshift of defendant's car.

¶ 46    Eldon Whitlow testified he was a client of Pamela, who was a financial advisor, and attended an appointment with her on the night of the murder. He reported being with Pamela until approximately 5:40 p.m., when he left to take care of a friend's pets.

¶ 47    A police officer testified he examined Pamela's phone, and GPS data on the phone suggested the phone left Pamela's office at 6:03 p.m.

¶ 48    Defendant's girlfriend at the time of the murder testified she went to defendant's house around 6:40 p.m. on November 3, 2014, but defendant did not come to the door. He later texted her that he had laid down in bed to read. She testified she went over to his house after 7:20 p.m. where they had a normal evening before she returned home for bed around 9 p.m.

¶ 49    The parties stipulated to the admission of a document that contained a table depicting the text messages sent between defendant and his then-girlfriend on November 3, 2014. The table indicated that these text messages had been deleted off of both parties' phones.

¶ 50    Defendant presented evidence from a therapist whose office was located near Doctors Park. The therapist testified she and a client heard three gunshots in short succession on November 3, 2014. She stated the clock in her office indicated the time was approximately 5:30 p.m. when she heard the shots.

¶ 51    Following this testimony, the State submitted a written argument in support of the admission of the statements in question. Defendant later filed a motion *in limine* to exclude these statements. The trial court subsequently received extensive oral arguments from the parties on the admissibility of these statements.

¶ 52                                    3. *The Trial Court's Ruling*

¶ 53        In July 2017, the trial court issued a written ruling that first concluded that the State had
proved by a preponderance of the evidence that defendant killed Pamela with the intent to
prevent her from testifying at a future proceeding relating to expenses for their children. The
court based its ruling on the gunshot residue found in defendant's car, the deletion of text
messages from defendant's cell phone received and transmitted on the night of the murder,
statements made by defendant in various recorded police interviews, "the inference that may
be drawn via circumstantial evidence of a car similar to defendant's being located in the
parking lot adjacent to the crime scene on the night Pamela was murdered," Mrs. Legg's
identification testimony, and ongoing financial issues "with reference to child[-]related
expenses shared by Pamela and the defendant at or near the time of her murder."

¶ 54        The trial court then analyzed the many statements offered by the State to determine which
would be admissible. According to the court, "[t]he proper question [was] what statements
and/or documents offered by the State are evidence of the defendant's specific intent to prevent
the victim from being a witness[.]" The trial court determined that three statements were
admissible: (1) the October 2014 FedEx letter sent from Pamela to defendant regarding $4000
owed in child support payments and threatening legal action; (2) Pamela's statement to her
attorney, Kathleen Kraft, by telephone on November 3, 2014, that "Kirk still hasn't paid. I sent
him a packet via FedEx. He hasn't responded. I have a copy for you. Let me know what
retainer will be required"; and (3) Marla Knuckey's testimony regarding Pamela's statement
that the defendant "wasn't going to be able to retire if he had to continue with all 'this', *i.e.*
child support."

¶ 55        The trial court then ruled, as follows:

            "All remaining statements and/or documents sought to be introduced by the State
            are not admissible under the doctrine of forfeiture by wrongdoing and Illinois Rule of
            Evidence 804(b)(5) as one or more of the following additional evidentiary
            considerations apply: not probative of any material fact; irrelevant; speculative;
            remote; improper lay opinion; lack of personal knowledge; cumulative; improper
            character evidence; and/or the probative value of the evidence is substantially
            outweighed by its prejudicial effect."

¶ 56        The trial court noted that because this was an interlocutory ruling on a motion *in limine*, the
State could still seek to introduce the evidence at trial. However, the court cautioned the State
to consider *People v. Floyd*, 103 Ill. 2d 541, 470 N.E.2d 293 (1984), and *People v. Munoz*, 398
Ill. App. 3d 455, 923 N.E.2d 898 (2010).

¶ 57                               D. The State's Motions to Reconsider

¶ 58        In August 2017, the State filed separate motions to reconsider the trial court's rulings on
the admissibility of the identification testimony and forfeiture by wrongdoing statements. The
State argued the statements of identification from the Guenthers were admissible and relevant
because they went to the credibility of Mrs. Legg's identification. The State also contended the
rule contained no limit on the number of identification witnesses who may testify and the court
should not impose one.

¶ 59        Regarding the forfeiture statements, the State argued the trial court applied the wrong
standard limiting the statements to those which directly showed defendant killed Pamela to

prevent her testimony. The State further asserted that the statements were relevant and admissible because they went to motive and intent. The State contended that by excluding them, the court was severely inhibiting the State from presenting its case. Alternatively, the State urged the court to address each statement individually so it could address the court's concerns at trial.

¶ 60 The trial court denied both motions. The court also declined the State's request to address the forfeiture by wrongdoing statements individually. In its ruling, the court reiterated that it had not added any extra requirements but was simply applying the law as the court saw it. The court stated it had not considered whether it was preventing either party from presenting its case because that was not what the court was doing. Instead, the court stated it was simply acting as a gate keeper and applying the rules of evidence.

¶ 61 This appeal followed.

¶ 62 II. ANALYSIS

¶ 63 The State appeals, arguing that the trial court erred by (1) granting its motions *in limine* only in part and (2) deeming inadmissible certain prior identification testimony and certain statements under the doctrine of forfeiture by wrongdoing. We disagree and affirm.

¶ 64 A. The Standard of Review

¶ 65 The State contends that although evidentiary decisions are ordinarily reviewed for an abuse of discretion, the trial court's rulings on the motions *in limine* should be reviewed *de novo*. The State asserts that in this case, "neither the credibility of the witnesses nor the facts are disputed and *** the question is whether the trial court properly applied a rule of law," thus making *de novo* review appropriate. Defendant counters that merely because the trial court applied the law to a set of facts does not transform the standard of review from abuse of discretion to *de novo*. Defendant argues *de novo* review is only proper when the trial court applies an erroneous rule of law. The State responds that the trial court did, in fact, erroneously apply the law by adding additional requirements to the hearsay rules it analyzed that are not found in the text of the rules or common law. We agree with defendant.

¶ 66 "As a general rule, a trial court's ruling on a motion *in limine* regarding the introduction or exclusion of evidence is reviewed under an abuse of discretion standard." *People v. Richter*, 2012 IL App (4th) 101025, ¶ 97, 977 N.E.2d 1257. In *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 52, the defendant made an argument similar to the one the State makes here—namely, that because the facts are not in dispute, *de novo* review is proper. In rejecting the argument, the First District explained *de novo* review is only proper when the trial court misinterprets an evidentiary rule so that the issue presented is solely a legal one. *Id.* ¶¶ 52-53.

¶ 67 The Illinois Supreme Court has stated that the manifest weight of the evidence standard, not the abuse of discretion standard, is proper when reviewing a trial court's rulings on the forfeiture by wrongdoing doctrine. *People v. Peterson*, 2017 IL 120331, ¶ 39. The court noted abuse of discretion is proper where the trial court must make a judgment call, but "[t]he admission of hearsay statements into evidence pursuant to the forfeiture doctrine, however, is not dependent on a judgment call by the trial court." *Id.* Instead, because "[a]dmission is dependent on whether the trial court finds, by a preponderance of the evidence, that the defendant engaged in wrongdoing that was intended to, and did, procure the witness's

unavailability," that finding is reversed only if it is against the manifest weight of the evidence. *Id.*

¶ 68    However, a careful reading of *Peterson* and *People v. Hanson*, 238 Ill. 2d 74, 939 N.E.2d 238 (2010), indicates that the manifest weight of the evidence standard applies to the trial court's finding of whether the doctrine applies; that is, whether the trial court properly found that the State had proved by a preponderance of the evidence that the defendant engaged in wrongdoing that was intended to, and did, procure the witness's unavailability. *Peterson*, 2017 IL 120331; *Hanson*, 238 Ill. 2d at 99. We note that both cases examined only whether the doctrine applied and did not consider the admissibility of the statements on other grounds. *Hanson* still requires the statements offered under the forfeiture doctrine to be "relevant and otherwise admissible," thus indicating the trial court still has discretion to exclude statements that would otherwise be admissible under the forfeiture doctrine if they are irrelevant or are barred by some other evidentiary concern. *Hanson*, 238 Ill. 2d at 99.

¶ 69    In this case, neither party contests the factual findings of the court. Therefore, we review the trial court's evidentiary rulings for an abuse of discretion. "A trial court abuses its discretion only when its decision is arbitrary, fanciful, unreasonable, or no reasonable person would adopt the view taken by the court." *Richter*, 2012 IL App (4th) 101025, ¶ 97.

¶ 70                    B. Statements of Identification

¶ 71    The State argues that the trial court applied the wrong standard when it found the Guenthers were "merely individuals who would be able to repeat what someone has said." According to the State, all identification testimony under Rule 801(d)(1)(B) and section 115-12 is necessarily a repetition of what someone said, and thus, the trial court's ruling had the effect of eliminating the prior identification exclusion to the hearsay rule. The State further contends that the court limited the State to one identification witness even though the Rule, statute, and case law contain no such limitation. Accordingly, the State asserts the trial court should not have found the Guenthers' statements to be repetitive or cumulative.

¶ 72    As additional support for this contention, the State analogizes section 115-12 to section 115-10, which deals with statements by child victims of sexual assault (725 ILCS 5/115-10 (West 2016)), and section 115-10.1, which deals with prior inconsistent statements (725 ILCS 5/115-10.1 (West 2016)), which courts have held do not limit the number of witnesses the State may present.

¶ 73    In response, defendant contends that the State takes the trial court's ruling out of context. Defendant asserts that the court did, in fact, rule that the statements were admissible as statements of prior identification but excluded them because they were cumulative. In particular, defendant asserts that " ' "[e]vidence is considered cumulative when it adds nothing to what was already before the jury" ' " (quoting *People v. White*, 2011 IL App (1st) 092852, ¶ 44, 953 N.E.2d 398, quoting *People v. Ortiz*, 235 Ill. 2d 319, 335, 919 N.E.2d 941, 950 (2009)), and the court's ruling reflects precisely such a finding. Defendant further claims the trial court found the Guenthers' statements were irrelevant because they lacked personal knowledge of the identification event, distinguishing this case from *People v. Beals*, 162 Ill. 2d 497, 643 N.E.2d 789 (1994).

¶ 74    We conclude that the trial court did not abuse its discretion when it found the Guenthers' statements inadmissible.

¶ 75                              1. *The Applicable Law*

¶ 76      Generally, a witness's prior consistent statements are inadmissible to corroborate the trial testimony of that witness. *Id.* at 507. However, this rule does not apply to statements of identification. *Id.* at 507-08. Section 115-12 provides:

> "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2016).

Similarly, Illinois Rule of Evidence 801(d)(1)(B) (eff. Jan. 1, 2011) provides "[a] statement is not hearsay if *** [i]n a criminal case, the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is *** one of identification of a person made after perceiving the person." The reason such statements are admissible is the "corroborative testimony is considered reliable *** because both the witness and the third person are subject to cross examination at trial." *Beals*, 162 Ill. 2d at 508.

¶ 77      Statements admissible under these rules are not limited to "a witness' actual identification of a defendant," but instead include "the entire identification process" so that the jury is fully informed concerning the reliability of the identification. *People v. Tisdel*, 201 Ill. 2d 210, 219, 775 N.E.2d 921, 926 (2002). Thus, testimony relating to prior instances of nonidentification is admissible. *Id.*

¶ 78                        2. *Application to the Facts of This Case*

¶ 79      Contrary to the State's arguments, the trial court did not apply an incorrect standard. Here, the trial court expressly found the Guenthers' statements were admissible as statements of prior identification when it denied the State's motion to reconsider. The court clarified that it was basing its ruling on other rules of evidence, not hearsay considerations. We agree with defendant that the court's statement that the Guenthers were "merely individuals who would be able to repeat what someone has said" indicates it found the testimony would be cumulative. Immediately after this statement, the court concluded as follows:

> "And so merely repeating the fact that an individual has identified a person to another person doesn't help anyone, the trier of fact included, from the Court's perspective, in assessing, and determining, and weighing what weight to give to that testimony, if all there is is being repeated [by] one, two, three, four, or more witnesses."

¶ 80      " 'Evidence is considered cumulative when it adds nothing to what was already before the jury.' " *White*, 2011 IL App (1st) 092852, ¶ 44 (quoting *Ortiz*, 235 Ill. 2d at 335). Here, the court gave a thorough explanation as to why it believed the Guenthers' testimony would not help the trier of fact in assessing and weighing the identification testimony. Most importantly, the court had already ruled that Mrs. Legg would be able to offer her in-court identification of defendant, and Mr. Legg would be able to testify as to her initial identification upon seeing defendant's photo in the newspaper. Given that the court's ruling not to admit the Guenthers' testimony followed a ruling to allow the testimony of the Leggs, we cannot say the court abused its discretion by determining the Guenthers' testimony would be cumulative.

¶ 81      The State is correct, and defendant concedes, that Rule 801(d)(1)(B) and section 115-12 do not contain any limitation on the number of witnesses a party may call to testify about prior identifications. However, the trial court did not erroneously create a rule limiting the number

- 11 -

of State's witnesses. Instead, as the court explained, its ruling was based on other evidentiary considerations—namely, the testimony was repetitive and cumulative.

¶ 82    The State argues that the trial court's conclusion that the Guenthers' testimony would "add nothing" was erroneous. The State points out that their testimony explains the progression of the police investigation and how an eyewitness came to the attention of police. The State further argues the testimony could rebut a claim that Mrs. Legg fabricated the identification for some ulterior motive such as publicity. Although the State's arguments are reasonable, they ignore the interlocutory nature of the trial court's ruling.

¶ 83    The Guenthers' testimony could be viewed as minimally relevant. That is, the prior identification to the Guenthers could assist the trier of fact in concluding that Mrs. Legg's identification was sincere. But that does not mean their testimony was not outweighed by other considerations. Here, the trial court was concerned that the State would have multiple witnesses testify to an out-of-court identification made months later. The court's apparent concern for improper, repetitive bolstering is understandable and not unreasonable.

¶ 84    Likewise, the State's arguments as to relevancy of the statements may also be well-taken. However, we will not substitute our judgment for that of the trial court, especially when, as here, the trial court supported the exercise of its considerable discretion with a thorough and logical explanation.

¶ 85    We also acknowledge that the State's concern about the credibility of its eyewitness may be well-founded. Both the Illinois Supreme Court and the United States Supreme Court have acknowledged that the length of time between the event and the identification is a factor for consideration. See *Tisdel*, 201 Ill. 2d at 219 (" 'What is the jury to make of this [one- or two-year] delay? The defense will attack the investigation ***.' " (quoting *People v. Tisdel*, 316 Ill. App. 3d 1143, 1162, 739 N.E.2d 31, 46 (2000) (Quinn, P.J., specially concurring))); *Neil v. Biggers*, 409 U.S. 188, 201 (1972) ("There was, to be sure, a lapse of seven months between the rape and the confrontation. This would be a seriously negative factor in most cases."). Indeed, in this very case, defendant has attacked the credibility of Mrs. Legg, in part, because of the length of time between the event and the identification.

¶ 86    However, as with all rulings on motions *in limine*, the trial court's ruling that the Guenthers' testimony is not admissible is interlocutory and subject to reversal at any time, including at trial. For instance, if defendant were to attack Mrs. Legg's credibility at trial and present evidence or argument claiming fabrication, as the State fears might happen, the trial court would be free to revisit its ruling and assess whether the probative value of the Guenthers' testimony is no longer substantially outweighed by its risk of being cumulative.

¶ 87    Last, the State cites a litany of cases in which courts expressly declined to limit the number of witnesses the prosecution could call under section 115-10. See, for example, *People v. Stull*, 2014 IL App (4th) 120704, ¶ 93, 5 N.E.3d 328 (collecting cases). Courts analyzing both that statute and section 115-10.1 have expressly refused to limit the number of witnesses who can testify to statements because the statutes contain no such limitation. See *id.*; *White*, 2011 IL App (1st) 092852, ¶¶ 43-46 (discussing 725 ILCS 5/115-10.1 (West 2010)). We note that defendant points out that section 115-10 contains an "indicia of reliability" requirement, and therefore, the cases are inapposite.

¶ 88    While we agree with the State that section 115-12 does not limit the number of witnesses it may call at trial, we decline the invitation to analogize the facts of this case with those analyzing section 115-10 and 115-10.1. In those cases, the issue was whether the trial court

abused its discretion by *allowing* multiple witnesses to testify. The issue here is whether the trial court abused its discretion by not allowing more witnesses to testify. Here, the trial court determined it would permit Mr. Legg to testify and, after carefully considering the evidence, determined the Guenthers' testimony would be repetitive and cumulative under the specific facts and circumstances of this case. The trial court was free to engage in that analysis, and its ultimate ruling was not an abuse of discretion.

¶ 89                                C. Forfeiture by Wrongdoing

¶ 90    Next, the State argues that the trial court misapplied the forfeiture by wrongdoing doctrine, which is codified in Illinois Rule of Evidence 804(b)(5) (eff. Jan. 1, 2011). The State first contends that the court's order was overly broad and excluded the offered statements for reasons that were not before it; specifically, the State asserts that the court erroneously concluded the statements were admissible under the forfeiture by wrongdoing doctrine but excluded them for various additional "evidentiary concerns" unrelated to Rule 804(b)(5).

¶ 91    The State also asserts that the trial court's order was overly broad, and therefore improper, because it unduly restricted the State's ability to present its case. Similarly, the State argues that the court erred by not addressing the specific reasons for excluding each individual statement, thereby making it impossible for the State to seek to introduce the statements at trial without violating the court's order and risking a mistrial.

¶ 92    Next, the State claims the trial court erred by adding two requirements to the forfeiture by wrongdoing doctrine: (1) that the statements be specific quotations from the declarant and (2) that the statements be related to the defendant's intent to procure the unavailability of the witness for trial.

¶ 93    Last, the State argues that the trial court abused its discretion by finding the proffered statements were irrelevant, speculative, remote, cumulative, or otherwise inadmissible under the rules of evidence.

¶ 94    In response, defendant contends that the trial court properly excluded the statements based on other evidentiary considerations raised by defendant in his own motion *in limine*. Defendant contends that the statements do not meet the minimum requirements for admissibility because they were, in fact, irrelevant, remote, speculative, and unduly prejudicial. Defendant asserts that "[u]ltimately, the State's arguments concerning the excluded evidence of alleged motive boils down to a mere disagreement with the trial court's discretionary decisions." We agree.

¶ 95    We first address whether the court properly applied the doctrine of forfeiture by wrongdoing to the statements at issue. Then, we consider the State's arguments relating to whether the trial court's order complied with the rules generally governing motions *in limine*.

¶ 96       1. *The Trial Court's Application of the Forfeiture by Wrongdoing Doctrine*

¶ 97    Rule of Evidence 804(b)(5) provides that "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness," is "not excluded by the hearsay rule." Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011). The forfeiture by wrongdoing rule is a codification of, and is coextensive with, the common-law doctrine. *Hanson*, 238 Ill. 2d at 97. This doctrine "serves both as an exception to the hearsay rule and to extinguish confrontation clause claims." *Id.* The doctrine is based on

the "equitable maxim that 'no one shall be permitted to take advantage of his own wrong.' " *Peterson*, 2017 IL 120331, ¶ 18 (quoting *Reynolds v. United States*, 98 U.S. 145, 159 (1878)).

¶ 98    The doctrine has two, and "only two[,] criteria or factors that must be satisfied for the admission of hearsay statements under the rule: (1) that the party against whom the statement is offered 'has engaged or acquiesced in wrongdoing' and (2) that such wrongdoing 'was intended to, and did, procure the unavailability of the declarant as a witness.' " *Id.* ¶ 32 (quoting Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011)). The Illinois Supreme Court has explained "that a defendant forfeits his ability to challenge the reliability of the declarant's statements by the very act of preventing the declarant from testifying," and "requiring additional indicia of reliability would undermine the equitable considerations at the very center of the forfeiture by wrongdoing doctrine." *Id.* ¶ 33 (citing *Hanson*, 238 Ill. 2d at 98). Accordingly, "so long as the declarant's statements are relevant and otherwise admissible, statements admitted under the forfeiture by wrongdoing doctrine need not reflect additional indicia of reliability." *Hanson*, 238 Ill. 2d at 99.

¶ 99    It is important to note that, in this case, the application of the doctrine is not at issue. Unlike most cases dealing with the doctrine, neither party challenges the validity of the trial court's finding that defendant murdered Pamela with the intent of preventing her from testifying at a future court proceeding. Neither party argues the hearsay rule or confrontation clause has any bearing on the admissibility of the evidence. Instead, this appeal concerns the scope of the evidence admissible under the doctrine of forfeiture by wrongdoing and the trial court's role in determining that scope.

¶ 100                          a. Limit as to "Specific" Statements

¶ 101   The State first argues that the court required the witnesses to testify to the exact wording of Pamela's statements in order for them to be admissible. Specifically, the State quotes various statements from the trial court where it instructed witnesses to "be as specific as possible," as opposed to giving a summary. We disagree for two reasons.

¶ 102   First, the trial court's order directly rebuts the State's contention. During the pre-trial hearings, the court clearly expressed a preference for "specific statements that were allegedly made by the deceased." The court admonished Knuckey in particular that "[g]eneral conversations like we have in real life or in the real world aren't the types of conversations that help us," and that "I'm going to ask you to be as specific as possible as to what you recall having been said to you by Pam Zimmerman. And if you don't recall specifically what was said, to indicate that. But what we really need is for you to be as specific as you possibly can."

¶ 103   The State's claim that these admonishments show the trial court was requiring something more from the witnesses than what is required under the rule is belied by the fact that one of the three statements the court deemed admissible was that of Knuckey that "Pam told [her] either in October of 2013 or 2014 that the defendant wasn't going to be able to retire if he had to continue with all 'this', i.e. child support." Immediately after Knuckey offered this testimony, defendant objected to the testimony as "irrelevant" and "speculative." The trial court overruled the objection but told the witness it preferred to have "specific statements" as opposed to the witness providing a summary.

¶ 104   Second, a thorough review of the record demonstrates that the trial court did not improperly limit any witness's testimony. Instead, the court simply indicated its strong and understandable preference for specific statements and informed some of the witnesses of this

preference. Thereafter, the parties elicited responses from the witnesses to the best of their abilities to recall.

¶ 105    Trial courts have broad discretion regarding how hearings on motions *in limine* and offers of proof will be conducted. *People v. Owen*, 299 Ill. App. 3d 818, 823, 701 N.E.2d 1174, 1178 (1998). Here, the court made clear it did not want summaries or editorial comments and asked the witnesses for their best recollections of what Pamela said to them. The court's doing so was entirely appropriate. Conclusions, speculations, statements of probability, or witnesses' opinions of what was said are not admissible. *People v. Riley*, 99 Ill. App. 3d 244, 252, 424 N.E.2d 1377, 1383 (1981); *People v. Holveck*, 141 Ill. 2d 84, 105-06, 565 N.E.2d 919, 928-29 (1990); *Allen B. Wrisley Co. v. Burke*, 203 Ill. 250, 257, 67 N.E. 818, 821 (1903).

¶ 106    The trial court is in the best position to evaluate testimony, and we will not substitute our judgment for that of the trial court. After thoroughly reviewing the record, we do not believe the trial court abused its discretion by unduly limiting or restricting the testimony of any witness. We acknowledge that the trial court was certainly aggressive in pinning down the exact statements sought to be admitted, but this was not improper under these circumstances.

¶ 107                              b. Limit of Subject Matter

¶ 108    The State next argues that the trial court erred by limiting the evidence under the forfeiture by wrongdoing doctrine to statements that "are evidence of defendant's specific intent to prevent the victim from being a witness."

¶ 109    The text of Rule 804(b)(5) does not limit the subject matter of the statements that may be admissible under the doctrine of forfeiture by wrongdoing. Additionally, courts that have considered this issue have held that the doctrine does not create a subject-matter limitation. *United States v. Dhinsa*, 243 F.3d 635, 652-53 (2d Cir. 2001) ("[W]e hold that [Federal Rule of Evidence] 804(b)(6) places no limitation on the subject matter of the declarant's statements that can be offered against the defendant at trial to prove that the defendant murdered the declarant."); *United States v. Emery*, 186 F.3d 921, 926 (8th Cir. 1999) ("The [forfeiture by wrongdoing] rule contains no limitation on the subject matter of the statements that it exempts from the prohibition on hearsay evidence."); *United States v. Gray*, 405 F.3d 227, 241 (4th Cir. 2005) ("[The rule] does [not] limit the subject matter of admissible statements to events distinct from the events at issue in the trial in which the statements are offered."); *State v. Ivy*, 188 S.W.3d 132, 147 (Tenn. 2006) (the rule "does not limit a declarant's statements to *past* events or *prior* offenses the declarant would have testified about" (emphases in original)).

¶ 110    We agree that the forfeiture by wrongdoing doctrine and Illinois Rule of Evidence 804(b)(5) do not limit the subject matter of admissible statements. The Illinois Supreme Court has explicitly stated that a defendant who intends to and does prevent a witness from testifying forfeits his or her right to object to the victim's statements on hearsay, confrontation, and reliability grounds. *Hanson*, 238 Ill. 2d at 98-99. Indeed, the supreme court has clearly held " 'that so long as the declarant's statements are *relevant and otherwise admissible*,' " no other requirements must be met. (Emphasis added.) *Peterson*, 2017 IL 120331, ¶¶ 32-33 (quoting *Hanson*, 238 Ill. 2d at 99).

¶ 111    Although the State is correct on this legal point, the State is not correct that this point has any relevance to the issue before this court on appeal. Here, the trial court explained it was rejecting the State's position that "any and all statements made by the deceased about the defendant for up to four years prior to her murder, *whether they are relevant and/or otherwise*

- 15 -

*admissible* should still be allowed to be heard by the jury." (Emphasis added.) Instead, the court stated: "Forfeiture by wrongdoing has a much more limited application ***. The proper question is what statements and/or documents offered by the State are evidence of the defendant's specific intent to prevent the victim from being a witness ***."

¶ 112 The trial court's focus on what evidence demonstrates the defendant's specific intent to prevent Pamela from being a witness is the correct inquiry when deciding whether the forfeiture doctrine applies in the first instance. Once this question is answered in the affirmative, as it was in this case, the only other questions for the trial court to consider are whether the evidence is (1) relevant and (2) otherwise admissible.

¶ 113 The record demonstrates the trial court did not abuse its discretion by admitting only three particular statements from Pamela. After delineating the admissible statements, the trial court stated the following: "All remaining statements and or documents sought to be introduced by the State are not admissible under the doctrine of forfeiture by wrongdoing and Illinois Rule of Evidence 804(b)(5) *as one or more of the following additional evidentiary considerations apply ***.*" (Emphasis added.) We deem this order adequate to show that the court was making clear that the remaining statements were excluded for reasons wholly separate and apart from the analysis of whether a particular statement falls under the doctrine of forfeiture by wrongdoing.

¶ 114 The trial court's ruling on the State's motion to reconsider further demonstrates the court was excluding the statements not because they did not meet forfeiture by wrongdoing requirements, but because they failed under the "otherwise admissible" prong mentioned in *Hanson*. The court here even directly addressed its holding that "not every statement by a deceased can be admitted under that section of the Illinois Rules of Evidence," and noted that "the [S]tate couldn't ask her [why she made the offered statements] even if she were still alive," because "you can't look at a statement in a vacuum[;] it requires analysis and assessment of the entire rules of evidence."

¶ 115 The trial court explained that it reviewed every statement "based upon all of the criteria that were noted within the order," and then listed each criterion. The list was virtually identical to that provided in the written order. Accordingly, we conclude that the trial court did not improperly add an additional requirement to the forfeiture by wrongdoing doctrine.

¶ 116 c. Whether the Statements Were Relevant and Otherwise Admissible

¶ 117 In the alternative, the State argues that the trial court abused its discretion when it ruled all remaining statements and documents were inadmissible based on other evidentiary considerations. In its brief, the State specifically addresses numerous statements it believes are particularly relevant and demonstrate why the trial court abused its discretion by finding them inadmissible. We need not address each statement directly. Instead, we will address a few statements to illustrate why the trial court did not abuse its discretion.

¶ 118 At first blush, the trial court's order restricting the admissibility of the State's evidence is somewhat confusing. After all, the court found, based on a preponderance of the evidence, that defendant murdered Pamela to prevent her from testifying at a future hearing concerning child support payments. This finding seems incongruous with deeming some of Pamela's statements to third parties inadmissible because, for the reasons the State argues, the statements demonstrated motive. However, the court explained the basis for its ruling in the order.

- 16 -

¶ 119      Specifically, the trial court relied upon documentary evidence, Mrs. Legg's eyewitness testimony, gunshot residue found in defendant's car, and the evidence of ongoing financial issues between defendant and Pamela "at or near the time of her murder." Given this context of evidence that the court had ruled could be admitted, as well as the admission of three of Pamela's statements pursuant to the forfeiture by wrongdoing doctrine, the trial court clearly believed the remaining statements offered by the State were unnecessary and of limited probative value. This finding of the limited probative value of the remaining statements, as we shall explain, is of critical importance.

¶ 120      As soon as the trial court admitted *some* of Pamela's statements pursuant to the forfeiture by wrongdoing doctrine, the probative value of the remaining statements changed. That is because, as the State correctly notes in its brief, *all* evidence offered at trial is prejudicial in that it is introduced for the purpose of proving the proponent's case or undermining the opponent's case; if it were not prejudicial, it would not be relevant. See *People v. Stevenson*, 2014 IL App (4th) 130313, ¶ 55, 12 N.E.3d 179 ("Defendant is correct the fact he has an opiate addiction could be prejudicial, as is most evidence introduced against a criminal defendant ***."); Michael H. Graham, Handbook of Illinois Evidence § 403.1, at 234 (2017 ed.) ("Since all effective evidence is prejudicial in the sense of damaging the party against whom offered, only unfairly prejudicial evidence calls for exclusion ***."). Hence, Rule 403 only prohibits *unfairly* prejudicial evidence, and even then, only when the probative value is *substantially outweighed* by that prejudice. Ill. R. Evid. 403 (eff. Jan. 1, 2011); *People v. Pelo*, 404 Ill. App. 3d 839, 867, 942 N.E.2d 463, 487 (2010).

¶ 121      Once the trial court decided that some of Pamela's statements were admissible, the probative value of her remaining statements decreases because those statements start to become cumulative. However, the level of those statements' potential prejudice remains the same, if not increases, due to repetition. Thus, the Rule 403 balancing test is constantly in flux as evidence is let in or kept out. This is what makes Rule 403 such an important tool in controlling the admission of evidence and why trial courts are granted vast discretion over evidentiary matters.

¶ 122      The State's assertion is incorrect that *Floyd*, 103 Ill. 2d 541, did not provide the trial court with a basis to exclude the victim's statements that she was afraid of defendant and that "if anything happened to her, defendant did it." Although the State correctly notes that *Floyd* dealt with the state of mind exception to the rule against hearsay and was decided prior to our supreme court's adoption of the forfeiture by wrongdoing doctrine, *Floyd* also based its holding squarely on the relevancy of the proposed statements. *Id.* at 547.

¶ 123      In *Floyd*, the State alleged defendant killed his wife. *Id.* at 543. Defendant asserted it was an accident, and to rebut this defense, the State offered various statements from the victim under the state of mind exception that demonstrated she was concerned for her safety, was afraid of defendant, and if anything happened to her, she wanted her parents to take care of their children. *Id.* at 544-46. The supreme court held the statements were improperly admitted because the victim's state of mind was irrelevant to the issues in the case and those statements could only be introduced for the purpose of demonstrating the defendant's propensity or likelihood of committing the crime. *Id.* at 547.

¶ 124      As in *Floyd*, it is unclear how Pamela's *generalized* statements in this case concerning her fear or suspicion of her ex-husband, on their own, relate in any way to defendant's motive, intent, or opportunity to commit murder. Had the testimony shown defendant made *threats* to

Pamela, and these threats *caused* her fears and suspicions, then the statements might be probative of defendant's state of mind—that is, his motive and intent. See *Hanson*, 238 Ill. 2d at 97-98 ("Had Katherine not been made unavailable by defendant's wrongdoing, she might have testified as to the threat defendant made against her."). Pamela's statements that she was afraid of defendant, without any further context, amount to an opinion as to defendant's character, opening the door to the possibility that the jury would convict defendant on an impermissible basis.

¶ 125    Despite our unwillingness to reverse the trial court, we nonetheless have some sympathy for the State's position. Before the trial court, the State argued that motive is not confined to any particular time. The State argues before this court that the divorce proceedings and certain statements from Pamela regarding defendant's attitudes toward money and his overwhelming concern for his pension and retirement date are all relevant to provide context as to why he murdered Pamela.

¶ 126    *Peterson* demonstrates that feelings about money, pension, and retirement can provide motive to kill both an ex-wife and a current wife. *Peterson*, 2017 IL 120331, ¶¶ 45, 75. The State's desire to paint a similar picture in this case is understandable. However, the statements and surrounding context in this case are different and not nearly as overwhelming as those present in *Peterson*.

¶ 127    Were we to consider this evidence in the first instance as the trial court did, we might very well have reached a different conclusion. However, that is not the issue before us. Our involvement in this case is as a reviewing court, which means that we will reverse the trial court's ruling only if it is arbitrary and unreasonable such that no reasonable person would agree. We conclude that the trial court's ruling was thorough, thoughtful, and, most important, not unreasonable based on the record before it.

¶ 128    For instance, we note that the trial court's decision to exclude statements made during the original divorce proceedings was not unreasonable. As defendant argued to the trial court, many of the statements the State sought to introduce were either (1) common to many divorce proceedings or (2) ran the risk of relitigating the couple's 2012 divorce. Examples are the State's seeking to introduce statements from Terry O'Riley that Pamela told her "[defendant] said that he was done paying for the children; it was her turn to pay now" and from Eric Hjerpe that Pamela told him she would not go after half of defendant's pension because "she did not want him taking anything out against the children." The State also sought to introduce statements prior to the divorce that defendant had said to Pamela, "If I can't have you, no one can," and "You'll never keep those kids if you divorce me." Further, the State sought to introduce testimony from Karen Anderson, a divorce mediator, as to conversations that took place during mediations pertaining to defendant's pension, including that defendant said "that isn't going to happen" before walking out, shortly after which Pamela said, "He is going to kill me. I'm really afraid he is going to kill me."

¶ 129    With the obvious exception of the last statement, many of these statements are not unusual in contentious divorce proceedings. Divorce is a stressful event for even the most well-adjusted and calm individuals. Because of the large number of statements the State sought to introduce, the trial court could have reasonably determined that in order to explain these statements, defendant would have needed to introduce testimony concerning the 2012 divorce, and the risk of confusing the jury was simply too great. This risk of confusion is certainly heightened where many of the comments were made over two years prior to Pamela's death,

and in the trial court's eyes, this two-year gap apparently significantly decreased the testimony's probative value.

¶ 130                                    D. Motions *in Limine* in General

¶ 131     The State's remaining arguments involve whether the trial court followed proper procedure in ruling on the motions *in limine*. First, the State contends the court's order was overly broad and excluded the offered statements for reasons that were not before it; specifically, the court erroneously concluded the statements were admissible under forfeiture by wrongdoing but excluded them for various additional "evidentiary concerns" unrelated to Rule 804(b)(5).

¶ 132     Likewise, the State argues the trial court's determination that the Guenthers' identification testimony would be cumulative was premature and should have been reserved for trial. The State also asserts the court's order was overly broad, and, therefore improper, because it unduly restricted the State's ability to present its case. Similarly, the State argues the court erred by not addressing the specific reasons for excluding each individual statement, thereby making it impossible for the State to seek to introduce the statements at trial without violating the court's order and risking a mistrial.

¶ 133                                          1. *The Applicable Law*

¶ 134     A motion *in limine* is addressed to a court's inherent power to admit or exclude evidence. *Stevenson*, 2014 IL App (4th) 130313, ¶ 26. These motions are designed to call to the attention of a trial court, in advance of trial, some evidence that is potentially irrelevant, inadmissible, or prejudicial and to obtain a pretrial ruling from the court excluding or permitting the evidence. *Id.* The utility of motions *in limine* comes from the fact that they are typically ruled on significantly in advance of trial. "As a result, motions *in limine* often achieve great savings of time and judicial efficiency," and if they resolve difficult evidentiary issues prior to trial, they can greatly encourage settlement or guilty pleas and streamline preparations for trial. *Owen*, 299 Ill. App. 3d at 822-23. Seeking a ruling in advance of trial also greatly assists the trial court by giving it adequate time to review and consider the evidentiary issue, research the matter, and consider whether to hold an evidentiary hearing. For these and other reasons, we strongly encourage litigants to take advantage of motions *in limine*.

¶ 135     The Illinois Supreme Court has called motions *in limine* powerful and potentially dangerous weapons because of their ability to restrict evidence. *Reidelberger v. Highland Body Shop, Inc.*, 83 Ill. 2d 545, 550, 416 N.E.2d 268, 271 (1981). Accordingly, such motions "must be specific and allow the court and the parties to understand what evidence is at issue." *Stevenson*, 2014 IL App (4th) 130313, ¶ 27. Written motions are strongly preferred, especially "whenever complicated or sensitive evidence is at issue." *Id.* This allows the movant to carefully identify the evidence sought to be excluded and articulate his or her argument in support, preventing confusion and misunderstanding by defining the evidence at issue and capturing the movant's arguments. *Id.* "If nothing else, a written motion allows the parties and court to refer to a fixed version of the movant's request." *Id.*

¶ 136     Likewise, rulings on motions *in limine* should be in writing so as to prevent confusion and misunderstanding. *Reidelberger*, 83 Ill. 2d at 550. "Trial judges should attempt to enter narrow *in limine* orders, anticipate proper evidence that might be excluded by the orders, and make the orders clear and precise so that all parties concerned have an accurate understanding of their limitations. An unclear order *in limine* is worse than no order at all ***." *Compton v. Ubilluz*,

353 Ill. App. 3d 863, 871, 819 N.E.2d 767, 776 (2004). "Before granting a motion *in limine*, courts must be certain that such action will not unduly restrict the opposing party's presentation of its case." *Reidelberger*, 83 Ill. 2d at 550.

¶ 137 One difficulty common to all motions *in limine* is that they occur—by definition—out of the normal trial context, and resolving such a motion requires the trial court to determine what that context will be. Thus, the court must receive offers of proof consisting either of live testimony or counsel's representations that the court finds sufficiently credible and reliable. *Owen*, 299 Ill. App. 3d at 823. As the court in *Stevenson* explained:

" '[A]n offer of proof serves dual purposes: (1) it discloses to the court and opposing counsel the nature of the offered evidence, thus enabling the court to take appropriate action, and (2) it provides the reviewing court with an adequate record to determine whether the trial court's action was erroneous.' *People v. Pelo*, 404 Ill. App. 3d 839, 875, 942 N.E.2d 463, 494 (2010) ***. An offer of proof may be formal or informal, but an informal offer of proof must identify the complained-of evidence with 'particularity.' *Pelo*, 404 Ill. App. 3d at 875, 942 N.E.2d at 494. An offer of proof is inadequate if it is a mere summary or 'offers unsupported speculation' about the evidence. *Id.* at 876, 942 N.E.2d at 494. While an offer of proof assists the parties, the trial court, and a reviewing court in determining the evidence at issue, 'a court is disadvantaged in ruling on a motion *in limine* because it is considered in a vacuum, before the presentation of the full evidence at trial that may justify admission or require exclusion.' *Compton*, 353 Ill. App. 3d at 871, 819 N.E.2d at 776." *Stevenson*, 2014 IL App (4th) 130313, ¶ 28.

¶ 138 The rules for offers of proof apply with equal force to motions *in limine*:

"[D]epending upon the nature of the evidentiary issue before it, the court has vast discretion as to how it will conduct the hearing on a motion *in limine*—that is, requiring live witnesses or representations, affidavits, or whatever—and the court has vast discretion as to how detailed such a hearing will be, as well." *Owen*, 299 Ill. App. 3d at 823.

¶ 139 Trial courts are free to exercise their discretion by not entertaining a motion *in limine* and instead requiring that the objection be raised in the normal course of trial, outside the presence of the jury. *Id.* This is because a court must "balance the prejudice that might be avoided if it grants the motion against the complication or inconvenience that would result if the motion is denied" (*Rush v. Hamdy*, 255 Ill. App. 3d 352, 365, 627 N.E.2d 1119, 1127 (1993)); and, in certain cases, the best way to ensure a correct ruling on a complicated evidentiary issue is to wait for that issue to become ripe at trial when the court has already heard the evidence, and the context in which the evidentiary ruling is to be made is clear. *Owen*, 299 Ill. App. 3d at 823-24.

¶ 140                                   2. *The Facts of This Case*

¶ 141 The State argues the trial court erred when it went beyond simply deciding if the specific doctrine at issue in each motion *in limine* applied and instead ruled based on other "evidentiary considerations." In other words, the State argues the trial court was required to rule solely on the issues of prior identification and forfeiture by wrongdoing and not address other evidentiary concerns. We disagree.

¶ 142    Motions *in limine* are a tool to streamline trials and greatly increase judicial economy. The State's argument that a trial court must make a determination based solely on the specific issue presented by the initial movant flies in the face of this policy. Defendant argues the trial court properly considered the arguments he raised in his responses and his motion *in limine* to exclude the same evidence that the State sought to introduce. However, even had defendant not done so, once a party seeks a ruling on the admissibility of evidence from the court, the court may, but is not required to, freely consider the admissibility of the evidence on any permissible basis. In other words, once the question of admissibility is presented, the trial court is a free agent and may evaluate the evidence under any and all *applicable* rules of evidence regardless of whether a party presented those grounds to the court. The decision whether to look beyond the arguments of the parties lies within the trial court's sound discretion.

¶ 143    A trial court may also decide a more limited inquiry is appropriate in certain circumstances. Thus, had the trial court decided to only address whether the doctrine of forfeiture by wrongdoing applied at all before taking up the issue of whether certain statements were "relevant and otherwise admissible," the court would not have abused its discretion. But, in this case, the court believed, and the record reflects, there was an adequate offer of proof and arguments from the parties on the totality of the admissibility of the statements for the court to make a holistic ruling. In short, the court acted properly when it went beyond the initial question presented by the State (whether Rule 801(d)(1)(B) and Rule 804(b)(5) applied) and ruled that the proposed statements were inadmissible pursuant to other applicable rules of evidence (that is, factors considered under Rule 403).

¶ 144    Next, the State argues the trial court's ruling on its motion *in limine* to admit statements under the doctrine of forfeiture by wrongdoing was overly broad because it did not address each statement individually and instead provided a list of multiple bases for exclusion. The State argues the vague nature of the order means it will be forced to guess as to the foundation required to overcome the court's ruling and therefore risk a mistrial. We disagree.

¶ 145    We are unaware of any authority requiring a trial court to make a separate ruling on each individual piece of evidence or statement offered in a motion *in limine*, and our holding in *Owen* indicates the contrary. *Owen*, 299 Ill. App. 3d at 824 (explaining trial courts do not abuse their discretion by declining to rule on a motion *in limine*). Here, although the trial court ruled on the motion *in limine*, it did not abuse its discretion by declining to address each individual statement or by listing the many reasons it believed the statements were inadmissible.

¶ 146    Additionally, the trial court was clear it would reconsider its ruling based upon the evidence actually presented at trial if the State would so request. We are not persuaded by the State's claim that it is unable to tell from the order what foundation it needs to lay or other evidence it needs to present at trial in order to address the trial court's concerns.

¶ 147    Rulings on motions *in limine* are, by their very nature, interlocutory and made based upon an expectation of the evidence that will be presented at trial. *Stevenson*, 2017 IL App (4th) 130313, ¶¶ 28-29. As such, a court is simply making its best guess as to what evidence will be presented and the context in which the proposed evidence will be offered.

¶ 148    Here, the parties did an excellent job of presenting evidence at the hearings on the motions *in limine*, and the trial court was well-served as a result. Not only did the parties thoroughly set forth the testimony they may seek to introduce at trial, but their arguments to the court set forth exactly how the evidence could be relevant and used at trial.

¶ 149    The interlocutory nature of motions *in limine* is why parties should reraise the issues during trial. The trial court is always free to reconsider and reassess its interlocutory rulings as the trial unfolds and context is provided.

¶ 150    The State is correct that all of the statements it sought to be admitted *could be* relevant at trial, depending on the context when they are offered. The court's order is clear that its ruling is preliminary and subject to change. In fact, in its briefs to this court, the State explains in detail how each statement could be relevant and provides the context for when they could be used at trial. Based on what the State has argued before this court, we believe it is amply prepared to lay the foundation and context necessary for the trial court to reconsider its ruling at trial. (In so observing, we in no way suggest the court must or should reach a different result, only that it will have the chance to revisit the issue in full context at trial if the State so requests.)

¶ 151    Last, the State argues the trial court's ruling was overly broad and "effectively gutted" the State's ability to present certain aspects of its case. For example, the State maintains "the trial court's ruling precluded the State from presenting evidence that the dispute over payment or non-payment of child support was a running problem *** and that defendant's desire to retire at a specific age was a long-term aspiration." We disagree.

¶ 152    The trial court's order is clear that only the *specific statements* offered by the State are inadmissible, not the underlying facts behind the statements or the subject matter of the statements. The trial court did not state in its written order that the State could not present *other* evidence that would support the State's belief that the murder was motivated by a long-running dispute over child-support payments and retirement age. Because the parties and the court have done such a thorough and exceptional job fleshing out the issues, it should not be difficult for the court to reconsider its ruling, if so requested, in light of the actual evidence presented at trial.

¶ 153    In closing, we commend the State for recognizing prior to trial potentially problematic evidence it believed was important to its case and for filing a motion *in limine* to give the trial court an opportunity to consider that evidence. We also commend defendant for skillfully and thoroughly responding to the State's motions, as well as for filing his own motions *in limine*. Last, we also commend the trial court for its thoughtful and careful consideration of the complex evidentiary issues presented by these motions *in limine*. We particularly appreciate the trial court's lengthy and detailed explanations that accompanied its rulings.

¶ 154                    III. CONCLUSION
¶ 155    For the reasons stated above, we affirm the trial court's judgment.

¶ 156    Affirmed.