2025 IL App (4th) 240967

NO. 4-24-0967

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Ogle County |
| SARAH L. SAFRANEK, | ) | No. 21CF91 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John C. Redington, |
| | ) | Judge Presiding. |

---

JUSTICE GRISCHOW delivered the judgment of the court, with opinion.
Justices Lannerd and Knecht concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant, Sarah L. Safranek, was charged with five counts of first degree murder (720 ILCS 5/9-1(a)(1)-(2) (West 2020)) and one count of aggravated battery to a child (*id.* § 12-3.05(b)(1)) stemming from the suffocation death of her seven-year-old son, N.B. The State filed numerous motions *in limine* seeking, *inter alia*, pretrial rulings on the admissibility of certain Google search history items found on defendant's cell phone, hearsay statements made by N.B. to numerous witnesses about defendant's conduct toward him, and two videos of N.B. describing instances of defendant's abuse. The trial court granted the State's motion to admit some of the requested evidence and denied the motion as to other evidence. The State filed this interlocutory appeal of the court's adverse rulings pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. Apr. 15, 2024).

¶ 2                            I. BACKGROUND

¶ 3                             A. Charges and Initial Pretrial Proceedings

¶ 4          On April 21, 2021, defendant was charged by information with five counts of first degree murder (720 ILCS 5/9-1(a)(1)-(2) (West 2020)) and one count of aggravated battery to a child (*id.* § 12-3.05(b)(1)) in connection with N.B.'s death, which occurred on February 17, 2021. A bill of indictment on all six charges was filed on May 4, 2021. In counts I and II, the State alleged defendant, acting without lawful justification and with the intent to kill or knowingly do great bodily harm, suffocated N.B. and caused his death (*id.* § 9-1(a)(1)). In count III, the State alleged defendant knew her conduct created a strong probability of death or great bodily harm to N.B. and caused his death (*id.* § 9-1(a)(2)). In counts IV and V, the State alleged defendant's conduct was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and was committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, or design to take a human life by unlawful means (*id.* § 9-1(a)(1), (b)(7), (11)). In count VI (aggravated battery to a child), the State alleged defendant, in committing a battery, knowingly caused great bodily harm to N.B. by suffocating him and causing him to suffer a ruptured liver (*id.* § 12-3.05(b)(1)). In proceedings not relevant to this appeal, defendant was denied pretrial release and remains in custody. The case was set for trial.

¶ 5         On May 31, 2024, both parties filed numerous motions *in limine*, seeking pretrial rulings regarding the admissibility of certain evidence. The two motions filed by the State at issue in this appeal are the State's motion *in limine* No. 1, seeking admission of defendant's Internet search history, and motion *in limine* No. 4, seeking admission of hearsay statements made by N.B. to numerous people about defendant's abusive conduct under section 115-10.2a of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.2a (West 2022)). The two

motions filed by defense counsel relevant to this appeal are defendant's "First Motion *in Limine* (To Exclude Hearsay Statements)" and "Motion *in Limine* No. 4 (Internet Searches)."

¶ 6                      B. Motions *in Limine* Regarding Internet Search History

¶ 7                                  1. *The Motions*

¶ 8          During the investigation into N.B.'s death, officers with the Oregon Police Department took possession of defendant's cell phone. Oregon Police Chief Shawn Melville manually searched the phone and found various videos and Google Internet searches. The State's motion *in limine* No. 1 sought admission of evidence found on defendant's cell phone, including a video of N.B. recorded in the dark (not part of this appeal) and numerous Internet searches found in the Google search history on defendant's phone made during the six months preceding N.B.'s death, as well as on the day of his death. The Google search history entries were listed as follows:

> "• 2/17/21 1pm: how long does an investigation take after a child passes away
>
> • 2/17/21 1pm: OJJDP [Office of Juvenile Justice and Delinquency Prevention] Portable guides to investigating child abuse
>
> • 2/17/21 6:44am: How much does cremation of a child cost?
>
> • 2/16/21 10:57pm: used clock
>
> • 2/16/21 10:32pm: used Facebook
>
> • 2/16/21 9:58pm: visited serious mental illness and what is not
>
> • 2/16/21 1:52pm: googled Scott Peterson and Laci Peterson
>
> • 12/8/20: how to kill someone with a voodoo doll
>
> • 11:16/20: 'buy arsenic online' 'arsenic (metal) powder buy online in India' 'wired.com best deadly poisons'

• 11/11/20: 'overdose of risperidone' 'Lisinopril-Drugs and Lactation Database' 'can I breastfeed while taking Lisinopril?' 'What's right about a 6-year-old that breastfeeds?' 'is it child abuse to nurse a 6-year-old?'

• 11/1/20: 'what is it called when a parent is obsessed with the thought of killing their child?' 'vice.com/why some mothers kill their children' 'Parents who kill: clinical and legal perspectives,' 'Parents who kill/psychiatric times'

• 8/5/20: 'I've had thoughts about killing my kid.' 'thoughts of killing my children-anyone else have them?' 'Does having scary thoughts mean you'll act on them?' 'after I had my last kid, my mental health when to s***.'

• 7/31/20: 'common cleaning products that will kill you instantly' '12 most dangerous household chemicals' and then several searches about suicide

• 7/30/20: 'how to quickly kill someone' '16 steps to kill someone and not get caught[.]' "

¶ 9    The State also sought admission of other Internet searches on defendant's phone, described in the motion *in limine* as follows:

"4.) Other internet searches including how to quickly kill someone, thoughts of killing my kid, thoughts of killing my children, what common household products can kill you fast, why people kill, and drugs that can kill you in 5 minutes.

5.) Law enforcement located additional internet searches for investigating child fatalities, how long an investigation takes, some common homicidal poisons, tackling the king of poisons, how can [T]razodone kill you, can [N]arcan help a [T]razedone [*sic*] overdose."

¶ 10          In defendant's "Motion *in Limine* no. 4," defense counsel sought to bar the State from presenting any evidence of defendant's Internet searches, arguing she would be unduly prejudiced because the searches were made on a device that was accessible to more than one person, specifically, other household members, and there was nothing in pretrial discovery establishing who conducted the searches or visited the websites.

¶ 11                                  2. *Hearing and Trial Court Ruling*

¶ 12          On June 28, 2024, the trial court held a hearing on, *inter alia*, the motions *in limine* regarding the Internet search history.

¶ 13          In support of the admission of this evidence, the State argued the fact that the cell phone was found in defendant's bedroom and showed her e-mail address on the phone was sufficient circumstantial evidence to prove it was defendant's phone and defendant conducted the Internet searches found on the phone. The trial court interjected to inquire about defense counsel's argument that there was no direct evidence that defendant personally made those searches on her phone. The State acknowledged there would be no witnesses testifying they saw her conduct the searches or otherwise giving an opinion as to whether she did so. However, the State countered defendant is "free to argue that it's weak," but that would be "about the weight of the evidence, not the admissibility." Citing *People v. Pelo*, 404 Ill. App. 3d 839 (2010), the State argued certain of the searches were relevant to establish defendant's identity as the person who conducted these searches on the cell phone, noting the searches about breastfeeding and being a parent were the type of searches defendant, a mother, would make. Citing *People v. Zirko*, 2012 IL App (1st) 092158, for support, the State contended the searches about other methods of killing a child were relevant to show defendant had been dealing with her thoughts about killing N.B. by planning and considering different ways to accomplish it.

- 5 -

¶ 14 In response, defense counsel argued the State's motion should be denied because there was no evidence defendant was the one who conducted the searches, noting there were other people in the household who had access to her cell phone. Counsel argued a Google account can be logged into from any device and searches made under that account can be seen on all devices used for access, so even if the searches were viewed on defendant's phone, it does not mean that the device was used to conduct the searches. Defense counsel argued further that Chief Melville was not an expert witness and was not qualified to testify about how to identify the origin of Internet searches found on a cell phone made via a Google account. Defense counsel purported the Internet searches were too prejudicial, as many had "nothing whatsoever" to do with a death. He argued the State was speculating when arguing the breastfeeding searches "must have been done by a woman." Defense counsel noted the Internet searches that occurred in July 2020 were too remote in time and did not relate to the issues the jury would be asked to decide.

¶ 15 In a written decision filed on July 1, 2024, the trial court ruled on the motions *in limine* regarding the admissibility of the Internet search history. The court concluded the State would be allowed to present, after laying a proper foundation, the following:

"A. 2/17/2021, 1:00 p.m., 'How long does an investigation take after a child passes away'.

B. 2/17/2021, 6:44 a.m., 'How much does cremation of a child cost'.

C. 11/1/2020, 'What is it called when a parent is obsessed with the thought of killing their child'. 'Vice.com/whysomemotherskilltheirchildren'.

D. 8/5/2020, 'I've had thoughts about killing my kid'. 'Thoughts of killing my children-anyone else have them?' "

All other Internet searches identified in the motion were deemed inadmissible, with no

explanation or reasoning for the decision given in the written decision.

¶ 16          C. Motions *in Limine* Regarding Hearsay Testimony

¶ 17                    1. *The Motions*

¶ 18          In its motion *in limine* No. 4, the State sought a pretrial ruling on the admissibility of hearsay statements made by N.B. pursuant to section 115-10.2a of the Code (725 ILCS 5/115-10.2a (West 2022)). The State sought to admit numerous statements N.B. made to five people at different times regarding acts of abuse committed by defendant against him, including choking, suffocation, and attempted drowning. The State also sought admission of three videos of N.B., which were recorded by his former foster parents, wherein he described acts of abuse committed against him by defendant.

¶ 19          Defense counsel filed a motion titled "First Motion *in Limine* (To Exclude Hearsay Statements)," seeking to exclude any and all hearsay statements made by N.B. to other civilian or law enforcement witnesses. Counsel argued any such statements violated defendant's rights under the confrontation clause of the United States and Illinois Constitutions (see U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8), would not fall into any exceptions to hearsay, and would be unfairly prejudicial and lack probative value.

¶ 20          The statements listed in the State's motion which are relevant to this appeal follow herein.

¶ 21                    a. Statements Made to Rhonda B.

¶ 22          The State sought admission of the following statements made by N.B. to his paternal grandmother, Rhonda B.:

> "• N.B. told her a few months ago before he was deceased that Defendant tried suffocating him with a pillow while he was sleeping;

• N.B. told her three (3) months ago before he was deceased that Defendant tried drowning him in a bathtub when N.B. stayed with her last weekend;

• N.B. told her several times that Defendant tried suffocating him with a pillow at night several time [*sic*] and that always happened when his father Bryan [B.] slept;

• N.B. told her that Defendant tried drowning him in a bathroom and that Bryan had to pull her off of N.B.;

• Around February 2020, Bryan brought N.B. over for her to watch him and she noticed bruises on N.B.'s back—N.B. said that Defendant beat him;

• N.B. told her in February 2021 that he doesn't like going home because mom is mean

    a. He wouldn't say why he was scared

    b. Defendant would give him Melatonin to make him sleep

• N.B. once told her 'I can't breathe grandma, she won't let me breathe.' "

b. Statements Made to Rebecca and Daniel Rhea

Rebecca and Daniel Rhea were N.B.'s foster parents for several months when he was five years old, and thereafter, periodically cared for N.B. in their home. The State sought admission of the following statements made by N.B. to Rebecca and Daniel in April 2020:

"• N.B. told the Rheas that Defendant was hurting him and explained that Defendant came in to [*sic*] the bathroom while he was taking a bath, turned off the lights, and tried drowning him;

• N.B. also said that another time he was lying on the couch and Defendant sat on his face and tried suffocating him

• N.B. accused Defendant of choking him."

¶ 25        In the motion, the State listed more statements made to Rebecca and Daniel, identified as occurring between 2018 and 2021; those pertinent to this appeal are:

"• N.B. told Rebecca that when Defendant wakes him up in the morning, she puts her hands on his neck and chokes him. N.B. has also told Rhonda this.

• Once, N.B. came over to stay and 'had a large gash on his head.' The gash could have used stitches, but Defendant never took him to the doctor.

• N.B. said, 'I didn't hit my head, mommy threw a phone at me.'

***

• N.B. said that he spilled juice and Defendant threw a phone at him.

• August 2018: N.B. said that Defendant chokes him.

***

• May 2020: N.B. told the Rheas that Defendant hurts him and she told him not to tell anyone else or she will hurt him.

• June 2020: N.B. told them that Defendant smothered him with a pillow until he couldn't breathe

• June 2020: N.B. said that Defendant sat on him with a pillow and laughed.

• June 13, 2020: N.B. told them that he was in a bathtub and Defendant held him underwater but he fought back.

• July 2020: Defendant would not let him go to the waterpark because he had red slap marks on his face—N.B. said Defendant punched him outside of a car—Defendant claimed his siblings did it.

• July 24-August 7th, 2020: N.B. said his sister didn't hit him but mom pulled over because they were arguing and Defendant punched him in the backseat of the car."

¶ 26                                c. Statements Made to Emma Busching

¶ 27        The State sought admission of statements N.B. made to Emma Busching, defendant's half sister, as follows: (1) "In 2020, N.B. told [Emma] that Defendant tried drowning him in a bathtub—he cried, she turned on the lights and walked out" and (2) "In April 2020, N.B. told her that [defendant] put a pillow over his head. He told her that he was scared of Defendant. Defendant told N.B. that she hated him because she had four (4) miscarriages."

¶ 28                                d. Videos of N.B.

¶ 29        The State sought admission of three separate videos recorded by Rebecca showing N.B. describing abuse he suffered at the hands of defendant, two of which are at issue in this appeal. The first video, recorded in the car (hereinafter car video), is described in the motion as follows:

"N.B. says that he did wanted [*sic*] to attack Defendant for sticking his head underwater, but is glad he did not because he would've 'gotten his butt whooped for sure.' The water was off, but she came in an 'tried to get me to not breathe' by grabbing his head and putting it underwater. N.B. had to fight back and hold himself up."

- 10 -

The second video, recorded in the living room (hereinafter living room video), is also described in the motion:

> "N.B. said he and his sister and M.B. were in the car with Defendant. N.B. and M.B. started fighting and Defendant slapped and punched N.B. in the face and head. N.B. cried a lot. Defendant just got back in the car and started driving. N.B. had sores on his cheek for one day. N.B. said he does not tell anyone because then he would get in trouble and be beat more. He says that is what Defendant says, and that he doesn't care because he has to tell the truth."

¶ 30　　　　These descriptions accurately summarize the content of the videos. The car video is 1 minute and 13 seconds long. It begins with the camera facing down on the car seat, and Rebecca and N.B. are already engaged in conversation. Rebecca asks N.B. questions about the incident in the bathroom, and he describes what happened. Toward the end of the video, the camera moves to show N.B. sitting in the back seat and looking out the window as he is speaking, but he turns to look at the camera just as the video ends. The living room video is three minutes and four seconds long. Daniel is seated in a chair, N.B. is leaning on an ottoman, and they are facing one another. They are in mid-conversation when Rebecca begins recording. Daniel asks N.B. questions about the incident in the car. N.B. looks at the camera a couple of times, and Rebecca interjects into the conversation a couple of times while she records.

¶ 31　　　　　　　　2. *The Hearing on the Motions Regarding Hearsay*

¶ 32　　　　A hearing was held on June 17, 2021, and witnesses were called to testify as to the statements made by N.B. to them.

¶ 33　　　　　　　　　　a. Emma

¶ 34        Emma (who now goes by Kameron but is still referred to throughout this case as Emma) testified she was defendant's 18-year-old half sister and N.B. is her nephew. In 2020, she lived with her mother, Rhonda B., in Cortland, Illinois. She saw N.B. often and played video games with him. Emma testified N.B. told her about "being drowned," which made her concerned for his safety with his mother. She testified N.B. told her this "multiple times over different occurrences," but she stated, "[T]he only thing that I can really remember very easily is that one of the last times he came over to me and my mom's place before he died." This was in the summer of 2020. Emma stated she and Rhonda had driven to Oregon to pick up N.B. and take him back to Cortland to stay with them for a few days. Emma and N.B. were riding in the back seat, and N.B. asked her if he could tell her something. Emma did not remember verbatim what N.B. said, but she summarized that he had been taking a bath and "[h]e just said that his mom started drowning him and that he fought back." Emma stated that her mother interjected that she did not believe he could have fought back and it was just his "imagination." Emma stated this upset her, and N.B. repeated two more times, "I fought back." Emma said she "might have" asked N.B. more questions about the incident, but she did not remember.

¶ 35        Emma testified that N.B. brought up the attempted drowning incident again while they were playing video games later the same day or the following day, and she asked him about fighting back. Emma testified she remembered "verbatim" N.B. responded, " '[Defendant] started crying and she stopped, and that's when I fought back.' " N.B. explained he fought back by using his hands and feet and by kicking defendant. Emma testified N.B. brought it up again while they were watching cartoons on the day he was going to return home. After N.B. started talking about the incident again, Emma asked him, " 'Are you sure this happened? Like, I believe you, Bud; I just wanted to make sure because, like, this is, like, a really serious issue.' "

She said N.B. was adamant that it did happen and he did not make it up. Emma stated she was 14 or 15 years old when this happened.

¶ 36            Emma also testified that earlier in 2020, N.B. spoke about an incident where defendant attempted to suffocate him. Emma stated N.B. began talking about the incident with Rhonda when they were all in the living room, but Emma did not hear the whole conversation. Emma stated Rhonda later attempted to discuss the incident with her, but she explained, "I didn't want to hear it from her." Emma explained, "[I]n my head that was an adult issue, and I didn't want to start freaking out about it." Later, Emma asked N.B. about it while they were in her room. When asked if N.B. told her the details, Emma said, "Usually before he'd go to bed, his mom would read him a bedtime story. And he said that she was just reading to him, and she asked him if he wanted to, like, play a game before he went to bed, and he said yeah." Emma did not remember exactly what the game was, but she stated, "[H]e just said that she would just take, like, the blanket or the pillow and would hold it over him for I don't know how long. He just said she held it over him." She testified N.B. told her it was hard to breathe and he used his feet to try to resist. She asked him if it actually happened, and his response was " 'Yeah.' "

¶ 37            On cross-examination, Emma stated she never spoke to the police about what N.B. told her, explaining "No, because I mean, with what proof did I have?" She confirmed the comments about the attempted drowning incident were made on the last weekend she saw N.B. She said she tried to get more details out of him, such as when it occurred, but she did not remember if he told her. She acknowledged she did not remember specifically when the discussion about the game with the blanket took place, but it was during the same year N.B. died, while he was spending the night at their home. Emma stated she never spoke to defendant about the incidents.

¶ 38　　　　On redirect examination, Emma explained she did not talk to the police at the time N.B. made the statements to her, but she did speak with police after his death as part of the investigation. She also clarified that she did not hear the whole conversation between N.B. and her mother when they were talking about the "blanket and pillow incident" because she walked away and returned to hear her mother ask N.B., " 'Are you sure?' " She did not know what N.B. told her mother while she was out of the room.

¶ 39　　　　　　　　　　　　b. Rhonda

¶ 40　　　　Rhonda, N.B.'s paternal grandmother, testified that her son, Bryan (N.B.'s father), was still in a relationship with defendant around the time of N.B.'s death. Rhonda stated N.B. lived in Oregon with his parents, but she saw him frequently. N.B. would stay at her home in Steward, Illinois, every weekend and sometimes on her days off of work. She testified, in February 2021, N.B. made statements about "suffocating or not being able to breathe." She and N.B. were sitting in the living room watching television, and she explained, "Out of the blue, he said it, and I went and hugged him." When asked his exact words, Rhonda stated, "There was several times. That time, too, he said, 'Mama is going to kill me,' and I explained, 'I'm trying to get you to move here.' And he said, 'Please hurry, Grandma.' " When asked specifically what N.B. said about suffocation, she said he would tell her, "Mama would take the pillow and hold it." He told her, " 'I can't breathe, Grandma, when she does it.' " When asked what N.B. was referring to, she explained, "He showed me that she was jumping on him." She said N.B. told her his mother would hold a pillow over his face and "wouldn't give up." Rhonda stated this was not the first time N.B. had told her this happened, saying he told her "multiple times" over "[p]robably the last four months" before he died. Rhonda testified, the prior times N.B. told her about this, he would say defendant put the pillow over his face while he was trying to sleep.

¶ 41        Rhonda testified N.B. also told her multiple times about defendant's attempts to drown him. Regarding one incident, she stated she and N.B. were in the living room and he told her, " 'Mama tried to drown me' when he was taking a bath and the doors were shut." He said it had occurred the previous night, and he physically demonstrated putting his hand up and pushing down his head and shoulders. She did not recall if he was talking about the same incident each time. The next day, Rhonda questioned defendant about N.B.'s statements when she came to pick him up, but defendant denied it and said N.B. was lying. Rhonda stated she "tried to call" the Illinois Department of Children and Family Services (DCFS). Rhonda said N.B. told her "about being drowned in the bathtub" multiple times, and he was referring to multiple incidents. Rhonda stated N.B. told her, "He tried to kick her and fight her off." She did not remember the time frame that N.B. told her about the attempted drowning incidents. She stated she observed bruises on N.B.'s back when he was taking a bath at her home. N.B. told her " ' Mama did it.' " Her son was also there at the time and told her defendant " 'beat [N.B.], and that's why she's in a psych unit.' " Rhonda testified she would ask defendant about each incident and defendant would claim N.B. was lying. Rhonda stated she spoke with her son about the incidents, and he said he did not know anything about them. She stated she called DCFS many times and received no follow up. Although she could not remember when, she stated she contacted the police about the things N.B. told her, but the police informed her she must "go through DCFS." Rhonda stated N.B. did not like living with his parents, he wanted to live with her, and she was "trying to get guardianship or something, but [defendant] wouldn't allow it because of the money." N.B. told her that defendant was "mean," explaining that "he had to fix his own breakfast and go to school, come home, fix his own snack, and she was always yelling at him."

¶ 42       The trial court inquired how many times Rhonda contacted DCFS. She explained it was "several times," and one day, just prior to his death, she called six different offices and "kept calling the 800 number." Rhonda explained that it was during the pandemic, and she left messages, but she never spoke to anyone from DCFS. She also stated she contacted the police in both Lee and Ogle Counties. Rhonda kept notes about her calls to DCFS in a journal, but she no longer had that journal.

¶ 43       On cross-examination, Rhonda clarified that she wrote important facts about these incidents in a journal she kept for about three years, but she no longer had it. Rhonda stated she had discussions with her son about arranging for N.B. to live with her. N.B. never told her Bryan was present during the attempted drowning incidents. She did recall that at some point, "maybe six months prior to N.B.'s death," N.B. said to her " 'Daddy had to come in and push Mama away and get me out of the tub.' " When asked again about whether Bryan knew about the incidents, she said he did not, but she then stated, "Except for there was a few. That one was one of them." When asked to clarify, she stated, "He did not know anything about it, but [N.B.] told me about Daddy pulling him off the—off him." She acknowledged N.B. only mentioned that he was alone in the bath until defendant tried to drown him. When Rhonda asked defendant about the incidents, which was three or four times, Bryan was not present. Regarding the bruising on N.B.'s back, Rhonda stated this disclosure was made toward the end of 2020 at her home. N.B. told her that he had run into the street, so defendant "grabbed him and beat him."

¶ 44       The following colloquy took place between Rhonda and the trial court:

        "THE COURT: If your grandson had told you on what you refer to as
        multiple occasions that his mother was trying to kill him, why would you not

simply refuse to turn him over at the end of your time to ensure that the law enforcement officials would then become involved?

A. I know I have tried. But it was—

Q. Tell me how you tried.

A. The last weekend I told her to leave him there.

Q. Right. But he told you multiple times before that that his mother was trying to kill him.

A. Right.

Q. Why on any of those occasions did you not simply, when Bryan or Bryan and [defendant] came to pick him up, say, 'He's not going anywhere; and if you want him, call the cops, and I'll tell them why he's not leaving'?

A. I agree. But I have tried, so yeah.

Q. How did you try to do what I just described?

A. I tried to keep him there.

Q. How?

A. Telling him I want to keep him for a few days so I could get things done, but they said—she said no unless—it was all over money, so—but I always contacted him to see how he's doing.

Q. So at least one occasion, if not multiple occasions, at the end of your visit you sent the child back to the woman that you said he said was trying to murder him?

A. I tried to keep him, yeah."

¶ 45                                 c. Rebecca Rhea

¶ 46 Rebecca testified that she and her husband, Daniel, were N.B.'s godparents and served as his foster parents for five months in 2014. N.B. referred to her as "Mama" and Daniel as "Papa." N.B. referred to his biological parents as "Mommy Sarah" and "Daddy Bryan." Four months after N.B. was returned to his parents, N.B. moved back in with the Rhea family, though DCFS was not involved with that decision. N.B. stayed with the Rhea family off and on until he was five years old (which was in September 2018). Shortly after he turned five years old, N.B. moved back to his parents' home. Rebecca stated she did not see him again until May 2020. Rebecca stated that N.B. made statements that made her concerned about his safety. She explained that one night in August 2018, when she was getting N.B. ready for bed, he said, " 'Mama Sarah chokes me,' " and he then showed her how it happened. Rebecca demonstrated what N.B. showed her for the court by placing her hands around her own neck. She stated she remembered N.B. telling her defendant grabbed him for "spilling juice or something."

¶ 47 Around 2018, defendant contacted Rebecca to ask if she wanted to see N.B. When Rebecca and her husband arrived at defendant's home to pick up N.B., she observed a "large gash" on N.B.'s head. Defendant explained N.B. had been running around and hit his head on the kitchen table. Rebecca explained the context in which N.B. spoke to her about his injury. While she and N.B. were playing in the living room, she told N.B. about the time her son fell and hit his head while running around at church and ended up needing stitches. This came up because N.B. had been running around at church the previous day. Rebecca suggested to N.B. it was similar to what happened to him. N.B. then told Rebecca, " 'I wasn't running,' " and he told her what happened. Rebecca testified that N.B. told her he was sitting at the table when something was spilled, and he said, " 'Mommy Sarah threw her phone at me, and it hit me in the head.' " He told her there was "blood all over the place and he grabbed his head."

¶ 48 N.B. repeatedly expressed reluctance to return to live with defendant and his father. Rebecca and Daniel often struggled to get N.B. out of the car due to his distress. One incident was the week before N.B. turned five, when Bryan came to get N.B. from the Rhea home, accompanied by a police officer. Rebecca explained defendant wanted N.B. returned to them, but Rebecca and Daniel had talked to the DCFS worker numerous times that day about their concerns for N.B.'s safety if they returned him to his parents. The DCFS worker ultimately told them there was "nothing we can do; he would have to go back." When Bryan and the officer arrived, N.B. was "hiding behind our legs. He didn't want to go." Rebecca said N.B. was scared, so they walked out to the car with him. While walking to the car, Rebecca told the officer and Bryan that defendant had abused N.B., including choking him, and they were scared for his safety. Bryan spent "over 20 minutes trying to get [N.B.] into the car seat." N.B. was screaming, crying, and kicking to avoid getting into the car. He was "begging" them, saying, " 'Mama, papa, help me help me. Please help me. I don't want to go. I don't want to go.' " When asked, the officer said he could not do anything, he was just there to "oversee." Rebecca and Daniel moved back to the porch to make it easier for N.B., but it took another 10 minutes before he finally got into Bryan's car.

¶ 49 Around this same time, Rebecca indicated she spoke to Rhonda on the phone about N.B.'s frequent "tummy issues" and learned Rhonda was aware defendant had choked N.B. Rhonda told Rebecca, "I think his tummy hurts because he's afraid to go back there." Rebecca also called the Lee County Sheriff's Office and reported what N.B. had been telling her. Rebecca learned about Shining Star Children's Advocacy Center (Shining Star) from a friend at church and arranged for N.B. to be interviewed that same week. Rebecca was not present for his interview, but she learned he did not make any disclosures of abuse. It was around this time,

N.B.'s fifth birthday, that he went back to living with his parents, and she did not see him again until 2020. Rebecca explained defendant told her she knew Rebecca and Daniel had called the authorities and, as a result, defendant would no longer allow them to see N.B.

¶ 50        Rebecca testified it was in May 2020 when defendant decided she and Daniel could see N.B. again. Rebecca and Daniel started keeping N.B. during the week, and his parents would take him back on the weekend. Rebecca and Daniel sometimes kept him on the weekend, too. Because N.B. was so behind in school, Rebecca began homeschooling him. As soon as he returned to their home, N.B. began telling them he was scared and defendant had been hurting him. Rebecca testified that N.B. said "he couldn't tell anyone, that we couldn't tell anyone because [defendant] told him if he said anything he would not be able to come back, and she would hurt him more if he said anything."

¶ 51        During the summer of 2020, when N.B. was staying with them, N.B. made statements about defendant attempting to drown him. These statements were made when they were in the car. Rebecca described the conversation as follows:

> "[H]e started to tell me that he was in the bathroom, he was in the bathtub, taking a bath. He said that Mommy Sarah came in and turned the lights off and she pushed his head under the water. And he said, 'I was kicking and trying to get away.' And he said, 'I couldn't get up. I couldn't get up.' He said, 'I kept kicking and kicking, and I couldn't get up.' And I guess obviously he must have given up or she let go or something."

At this point, they had pulled into the driveway, Rebecca picked up her cell phone and held it out of N.B.'s sight, began recording, and asked him to repeat what he had just said, which he did. When she moved her cell phone to stop recording, N.B. saw it and said to her, " 'Mama, what are

you doing,' " " 'You can't'—you know, 'I'm scared.' " Rebecca explained N.B. did not want anyone to find out. This video was admitted without objection and played for the trial court.

¶ 52          Rebecca testified N.B. also told her that summer about other incidents of defendant trying to suffocate him. N.B. told her he was kneeling by the couch with the cushion off and playing with toy cars when defendant threw the cushion over him, sat on it, and would not get off. N.B. said he could not breathe. When asked what his father was doing, N.B. told Rebecca, " 'He finally came and pulled her off of me.' "

¶ 53          Rebecca stated N.B. told her about defendant hitting him, including being "head-butted" by defendant when she would get angry. In June 2020, during a time when N.B. was staying with his parents, Rebecca called to ask if she could take him to a park for a family event. Initially, defendant said yes, but later texted to inform Rebecca that N.B.'s face was " ' pretty red' " because he had been in a "slapping fight" with a sibling, but she said he was " 'okay.' " The following morning, when they were leaving to go to Oregon to pick up N.B., Rebecca texted defendant to inform her they were on their way, but she received no response. Just as they were about to arrive to get N.B., defendant texted, " 'He's not going. He's been naughty and won't listen to me. He's not going.' " About a week later, N.B. was allowed to go back to Rebecca's house. While Rebecca was playing with N.B., she asked him about the prior weekend. N.B. told her he did not know anything about the plans to go to the park. Rebecca asked N.B. about his face being red because of a "slapping fight" with his sister. N.B. told her that was not what happened. N.B. told her he and his sister got into an argument in the car. Defendant pulled over, opened his side door and he said, " 'She started going like this to me in the face, like this and this.' " The trial court acknowledged Rebecca demonstrated this by

"showing both of her fists coming from each side in a rapid fashion towards her own face." Rebecca was told it hurt a lot.

¶ 54 Rebecca testified she took notes about N.B.'s disclosures of abuse and had been doing so since he first started living with her and Daniel when he was five months old. She took notes about visits with his parents, any injuries he had, and how he was "agitated" when they would bring him back from bonding sessions with his parents.

¶ 55 On cross-examination, Rebecca testified she met defendant's family at church. Rebecca acknowledged she told defendant's mother she and her husband were interested in adopting a child because she, herself, was adopted as an infant. Rebecca testified the last time she saw N.B. before he died was toward the end of October 2020. His last disclosures were made in the summer of 2020. She acknowledged N.B. did not tell her the date or other details about the disclosure he made in August 2018 that "Mama Sara chokes me." Regarding N.B.'s disclosure that defendant threw her phone at him, causing the large gash in his head, she acknowledged she did not know exactly when that occurred. Rebecca stated N.B. was four years old and "very shy" when he was interviewed by Shining Star and did not make any disclosures. She acknowledged the incidents regarding defendant choking N.B., N.B. suffering the gash on his head, and N.B. stating he did not want to go home all occurred before September 2018. Rebecca stated she has no knowledge about what happened to N.B. from September 2018 through May 2020.

¶ 56 After referring to a statement she gave to police, Rebecca recalled the day N.B. told her defendant attempted to drown him was July 13, 2020, the same day her husband had a medical emergency and was hospitalized in Madison, Wisconsin. That day, she contacted defendant and Bryan to inform them of the situation because N.B. could not go to the hospital with them due to COVID-19 restrictions. Rebecca denied planning to leave N.B. with defendant

and Bryan. She just wanted to make them aware they were trying to get N.B. in the care of Rhonda. Rebecca's adult daughter eventually connected with Rhonda and took N.B. to her.

¶ 57          On redirect examination, Rebecca clarified she met defendant and her family through church in 2000. Rebecca stopped attending when they moved to Dixon, Illinois, in 2006. Rebecca's family did not have any contact with defendant's family until they reconnected after a chance meeting between Daniel and Rhonda in 2013. Rhonda contacted Rebecca and Daniel when N.B. was removed from defendant's care by DCFS as a possible foster family for N.B.

¶ 58                              d. Daniel Rhea

¶ 59          Daniel Rhea, Rebecca's husband, testified as to his relationship with defendant's family and N.B. When asked about the time N.B. had a large gash on his head, Daniel recalled defendant told him N.B. was running around, fell, and hit his head on a table. Daniel said later, N.B. told him he lied about the incident and that "Mama Sarah had thrown the phone at him and hit him in the head. And those were his exact words." Daniel stated he and N.B. would sit together in a chair in the living room and talk, and "[t]here were times where he would express to me that she would be mean to him, and I believe it was at that point in time when I talked to him about the gash on his head." Daniel mentioned the incident with his own son, who had been injured while running in church, which was when N.B. told him he was not running and explained what happened.

¶ 60          Daniel testified N.B. told him multiple times defendant tried to drown him. Daniel explained when N.B. came to their house after not having visited for a long time, he ran up to Daniel and said, "Pop, Pop, we've gotta talk," and, "Mama Sarah's being mean to me." When asked to explain, N.B. told Daniel, " 'I was in the bathroom taking a bath, and she came in and shut the lights off. And she grabbed me around the neck and the shoulders and held me under the

water.' " Daniel said N.B. told him, " 'Pop, I fought and I fought until I could finally get out.' " N.B. said no one helped him, but " 'I finally fought enough that she left me alone.' " Daniel testified he and N.B. had a "little joke," wherein N.B. would say, " 'Papa, one of these days Jesus is going to work it out and I'll be with you guys forever because you're my real family.' " And Daniel said he would reply, " 'Well, one day Papa will probably just take you and kidnap you and take you to Mexico and change your name to Jose, and then nobody will find you and you'll be all right for the rest of your life.' " Daniel testified he and N.B. would acknowledge this would be wrong, but N.B. understood Daniel just wanted N.B. to be safe. N.B. would reaffirm, " 'I know, Papa, but Jesus will work it out.' " Daniel testified when N.B. spoke about the drowning incident, it was because N.B. would bring it up.

¶ 61 On one occasion, while sitting together in the living room, N.B. also spoke to Daniel about defendant striking him, and part of this conversation was recorded on video by Rebecca. This video was played for the trial court.

¶ 62 Daniel testified that he told Bryan each time N.B. talked to him about defendant's abuse. On one occasion, when Bryan was accompanied by a police officer to pick up N.B., Daniel also informed the police officer, who told him "his hands were tied, that he couldn't do anything." Sometime thereafter, a DCFS caseworker came to the Rheas' home to interview N.B. Daniel listened to the conversation from an adjacent room and heard N.B. tell the caseworker everything he had previously said about defendant. Daniel spoke to the caseworker as he was leaving and asked what could be done to help N.B., and the caseworker told him " 'my hands are pretty tied.' During the pandemic—he said, 'There's really not much I can do because this information is two weeks old.' " Daniel said he told the caseworker, " 'You are his last line of

defense,' " and, " 'If he goes back, she's going to kill him.' " Daniel testified he "begged" and "pleaded" with the caseworker to do something, but he did nothing.

¶ 63    On cross-examination, Daniel confirmed the first thing N.B. told him when he walked through the door in May 2020 (after having been out of contact with him for a long period of time) was defendant had tried to drown him. He acknowledged he did not call law enforcement and explained DCFS was involved. Daniel stated he was unaware Rebecca was recording the conversation he had with N.B. until he saw the video just "the other day." Daniel stated during the conversation, he was trying to gather information from N.B. about what defendant had done to him. Daniel did not call the police after the conversation.

¶ 64    3. *Ruling on the Motions in Limine Regarding Hearsay Testimony*

¶ 65    In June 2024, the trial court issued its written decision. The court found the statements were not testimonial in nature and were not violative of defendant's confrontation clause rights as set forth in the United States and Illinois Constitutions (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8). Citing this court's decision in *People v. Richter*, 2012 IL App (4th) 101025, the trial court found section 115-10.2a of the Code (725 ILCS 5/115-10.2a (West 2022) ("Admissibility of prior statements in domestic violence prosecutions when the witness is unavailable to testify.")) provided the proper basis for addressing the issues.

¶ 66    The trial court denied the State's motion as to all statements N.B. made to Emma and Rhonda, finding them all inadmissible. The court failed to provide any explanation or reasoning for this decision in the record.

¶ 67    The following statements made by N.B. to Rebecca and Daniel were allowed. When Rebecca and Daniel were caring for N.B. in April 2020, N.B. told them (1) defendant was hurting him and explained that defendant came into the bathroom while he was taking a bath,

turned off the lights, and tried drowning him; (2) N.B. was lying on the couch and defendant sat on his face and tried to suffocate him; and (3) defendant choked him. During the time frame of 2018 through 2021, (4) N.B. told Rebecca when defendant wakes him in the morning she puts her hands on his neck and chokes him; (5) N.B. said, "I didn't hit my head, mommy threw a phone at me"; (6) N.B. said he spilled juice and defendant threw a phone at him; (7) in June 2020, N.B. said defendant sat on him with a pillow and laughed; (8) on July 13, 2020, N.B. told them he was in a bathtub and defendant held him under water but he fought back; (9) in July 2020, N.B. explained the weekend he did not go to the park with Rebecca and Daniel was because he had red marks on his face after defendant punched him while outside of the car, not because his sibling slapped him; and (10) between July 24, 2020, and August 7, 2020, N.B. said his sister did not hit him, but defendant pulled the car over because they were arguing and defendant punched him in the back seat of the car.

¶ 68          All other statements made by N.B. to Rebecca and Daniel listed in the State's motion *in limine* were deemed inadmissible, again, without explanation given by the trial court. For clarity, the statements made to Rebecca and Daniel that were not allowed and are being challenged in this appeal (as listed in the motion) were (1) "August 2018: N.B. said that Defendant chokes him," (2) "May 2020: N.B. told the Rheas that Defendant hurts him and she told him not to tell anyone else or she will hurt him," and (3) "June 2020: N.B. told them that Defendant smothered him with a pillow until he couldn't breathe."

¶ 69          Regarding the two videos pertinent to this appeal, the trial court deemed them inadmissible because their prejudicial value substantially outweighed their probative value. The court stated, "However, should the existence or accuracy of their statements on the videos be

challenged during the witness's oral testimony of said statements as authorized herein, then the videos may be allowed (after seeking leave of Court) for rebuttal purposes only."

¶ 70    This appeal followed.

¶ 71                    II. ANALYSIS

¶ 72    The State filed this interlocutory appeal of the trial court's pretrial evidentiary rulings pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. Apr. 15, 2024), which provides, in pertinent part, "the State may appeal only from an order or judgment the substantive effect of which results in *** suppressing evidence." When appealing a pretrial suppression order, the State must certify to the trial court that suppression of the evidence substantially impaired the State's ability to prosecute the case. See *id.* In this case, the denial of parts of the State's motions *in limine* had the substantive effect of suppressing evidence, and we accept the State's good-faith evaluation of the impact of that decision on its ability to proceed at trial. See *People v. Sneed*, 2023 IL 127968, ¶ 58. As such, this court has jurisdiction to consider this appeal.

¶ 73    "A motion *in limine* is addressed to a court's inherent power to admit or exclude evidence." *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 134. These motions are designed to bring to the trial court's attention potentially irrelevant, inadmissible, or prejudicial evidence and obtain a pretrial decision to exclude or permit the evidence. *People v. Stevenson*, 2014 IL App (4th) 130313, ¶ 26. "The Illinois Supreme Court has called motions *in limine* powerful and potentially dangerous weapons because of their ability to restrict evidence." *Zimmerman*, 2018 IL App (4th) 170695, ¶ 135 (citing *Reidelberger v. Highland Body Shop, Inc.*, 83 Ill. 2d 545, 550 (1981)). As such, trial courts should endeavor to make such orders "clear and precise so that all parties concerned have an accurate understanding of their limitations." (Internal quotation marks omitted.) *Id.* ¶ 136. A trial court's ruling on a motion *in limine* regarding the introduction or

exclusion of evidence is reviewed for an abuse of discretion. *Richter*, 2012 IL App (4th) 101025, ¶ 97. An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the court's view. *People v. Starks*, 2012 IL App (2d) 110273, ¶ 20.

¶ 74 The State takes issue with the trial court's decision to deny admission of multiple items of evidence enumerated in its motion *in limine*, which can be categorized as follows: (1) numerous entries in the Google search history found on defendant's phone, (2) all hearsay statements made to Rhonda and Emma and some statements made to Rebecca and Daniel, and (3) two video recordings of N.B. taped by Rebecca wherein N.B. describes certain instances of defendant's abuse. We will address each category of evidence separately.

¶ 75 However, we must first address the State's more general argument as to the trial court's decisions regarding defendant's Google search history and the hearsay statements constituting an abuse of discretion for failing to provide detailed explanations of its reasoning. Specifically, the State argues the court denied admission of the majority of defendant's Google search history "without providing any reason or explanation for the completely arbitrary line drawn between what would be and would not be admissible" and totally failed to provide any basis for its decision to exclude all hearsay statements made to Rhonda and Emma and many statements made to Rebecca and Daniel.

¶ 76 As previously stated, the trial court has broad discretion with respect to motions *in limine*. Our supreme court has stated rulings on motions *in limine* should be in writing so as to prevent confusion and misunderstanding during trial, the concern being that " '[a]n unclear order *in limine* is worse than no order at all.' " *Zimmerman*, 2018 IL App (4th) 170695, ¶ 136 (quoting *Compton v. Ubilluz*, 353 Ill. App. 3d 863, 871 (2004)). In this case, the trial court's written

orders containing its rulings on the motions *in limine* clearly stated what evidence was and was not allowed but provided little explanation for each ruling. However, contrary to the State's contention, the trial court is not *obligated* to provide a detailed, written explanation for its evidentiary rulings. *Id.* ¶ 145. This case does illustrate that best practices would be for the trial court to give *some* explanation for the basis of its ruling on these matters to not only provide clarity to the parties but also, importantly, to establish a supporting record on appeal. Although some explanation either in the written decision or when the trial court presented its ruling from the bench undoubtably would have been helpful to this court on review, the question before us is the correctness of the trial court's evidentiary rulings and not the reasons it may have relied upon for its decision. See *People v. Johnson*, 208 Ill. 2d 118, 129-31 (2003). The decision may be affirmed on any ground supported by the record. See *id.*

¶ 77        We further acknowledge the unique circumstances presented by pretrial orders *in limine*. Such decisions are "considered in a vacuum, before the presentation of the full evidence at trial that may justify admission or require exclusion." (Internal quotation marks omitted.) *Zimmerman*, 2018 IL App (4th) 170695, ¶ 137. The trial court is "simply making its best guess as to what evidence will be presented and the context in which the proposed evidence will be offered." *Id.* ¶ 147. As such, orders *in limine* are essentially transitory in nature, meaning the trial court may alter or reconsider its rulings later during the trial depending on the state of the evidence. An interlocutory appeal of such a ruling requires this court to assess the evidence as proffered to the trial court in a similar vacuum on appeal, understanding that as the trial court proceedings progress in this case, the court may allow the decisions to be altered moving forward.

¶ 78        A. Evidence of the Google Search History on Defendant's Cell Phone

¶ 79    In its motion, the State sought admission of 14 specific items from the Google search history on defendant's cell phone, 7 of which were purportedly made during the day of and the few days before N.B.'s death in February 2021 and 7 of which were dated between July 30, 2020, and December 8, 2020. The State also sought admission of other searches generally described but without any reference to when they were made. In its ruling, the trial court determined, with proper foundation made at trial, two of the specific searches made on the day N.B. was found deceased and two of the searches made in the months prior to his death were admissible. The remaining requested items on the list were deemed inadmissible.

¶ 80    The specific items from the Google search history that were deemed inadmissible can be subcategorized as follows: (1) searches about other methods of killing (including voodoo doll, arsenic poisoning, deadly drugs, deadly poisons, overdose of Risperidone, common cleaning products that are deadly, how to quickly kill someone, and whether Trazodone can cause death); (2) searches about parents who kill, child abuse and death investigations, and "serious mental illness"; and (3) searches relating to breastfeeding and searches showing access to Facebook and the clock. We will address each subcategory separately.

¶ 81    Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). The basic rule is that all relevant evidence is admissible unless a specific law requires its exclusion. *People v. Cruz*, 162 Ill. 2d 314, 348 (1994). However, a court may also exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). As

with other decisions regarding motions *in limine*, whether the probative value of the evidence is outweighed by its prejudicial effect is a matter left to the sound discretion of the trial court. *People v. Illgen*, 145 Ill. 2d 353, 375 (1991).

¶ 82                              1. *Searches About Other Methods of Killing*

¶ 83        The State first argues defendant's Google search history containing searches of other methods of killing corroborated N.B.'s disclosures that defendant had a plan to kill him because she conducted those searches during the time when N.B.'s disclosures were reported. The State contends this evidence was relevant to support its theory defendant planned, prepared, and intentionally killed N.B. In two of the first degree murder counts (720 ILCS 5/9-1(a)(1) (West 2020)) (counts IV and V), the State alleged defendant's conduct was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and was committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, or design to take a human life by unlawful means (720 ILCS 5/9-1(b)(7), (11) (West 2020)). As such, the State's theory of the case is defendant had a calculated plan to intentionally kill N.B. and defendant's Internet searches into various methods of doing so were relevant to proving "intent, preparation, plan, knowledge, identity, and absence of mistake or accident" and were essential to establishing defendant's guilt.

¶ 84        In granting the State's hearsay motion *in limine* in part, the trial court allowed hearsay testimony of N.B. wherein he told Rebecca and Daniel that defendant hurt him, attempted to drown him in the bathtub, tried to suffocate him by sitting on him with a pillow over his face, and choked him. This evidence reveals defendant engaged in three separate methods of abuse that had the potential to end N.B.'s life. Evidence of defendant's Internet searches on various methods of killing, including poisons and household chemicals, leading up

to N.B.'s death, is relevant to demonstrate intent, plan, knowledge, and absence of mistake. See *Zirko*, 2012 IL App (1st) 092158, ¶¶ 42-43 (finding Internet browsing history presented at trial, including searches showing defendant was considering various methods of killing the victims, was properly admitted and relevant to show the defendant's motive and intent to commit the murders). However, even relevant evidence can be deemed inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or if it would constitute unnecessary presentation of cumulative evidence.

¶ 85          In this case, the trial court allowed four items in defendant's Google search history to be admitted: (1) a search for "How much does cremation of a child cost" conducted at 6:44 a.m. on the morning N.B. died (emergency medical services reports reflect defendant called 911 around 2:47 a.m.; DCFS reports show at 4:48 a.m., defendant reported she found N.B. deceased in his bed); (2) a search for "How long does an investigation take after a child passes away" conducted at 1 p.m. on the day N.B. died; (3) a search for "What is it called when a parent is obsessed with the thought of killing their child" and a website: "Vice.com/whysomemotherskilltheirchildren" in November 2020; and (4) a search for "I've had thoughts about killing my kid" and "Thoughts of killing my children-anyone else have them?" in August 2020. It is reasonable to conclude these Internet searches related most closely to defendant's alleged conduct in this case and tended to support the State's theory regarding defendant's intent, preparation, plan, knowledge, and absence of mistake or accident. In contrast, the searches that were not allowed could be considered cumulative (defendant searching various methods of killing someone being duplicative of defendant's searches acknowledging she had thoughts of killing her child) or substantially outweighed by their prejudicial effect (reference to a voodoo doll). The trial court is presumed to know the law and apply it correctly, absent a

strong affirmative showing in the record to the contrary. *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 62. The Google search history items allowed directly supported the State's theory of the case that, as early as August and November 2020, defendant was contemplating killing her child, and in the hours after N.B. was killed, she was researching the aftermath of that decision. In this case, we cannot conclude the trial court's decision to exclude the additional Google search history items regarding other methods of killing was arbitrary, fanciful, or unreasonable or that no reasonable person would take the court's view.

¶ 86        2. *Searches About Parents Who Kill, Child Abuse and Death Investigations, and Serious Mental Illness*

¶ 87        Second, the State argues the trial court erred in refusing to allow other enumerated items in defendant's Google search history related to parents who kill, child abuse and death investigations, and serious mental illness. Specifically, the State points to the following searches: (1) a search of "[Office of Juvenile Justice and Delinquency Prevention] Portable guides to investigating child abuse" on the day N.B. was found deceased, (2) a search for "serious mental illness and what is not" on the evening before N.B.'s death, (3) two searches referencing "parents who kill," (4) a search for "Does having scary thoughts mean you'll act on them?," and (5) a search of "After my last kid, my mental health went to s***." The State's sole argument on appeal is the trial court's failure to specifically explain the "line that was drawn between what was and was not allowed was nothing if arbitrary and unreasonable, and it unduly restricted the State's ability to present its case."

¶ 88        As previously stated, the trial court was not obligated to delineate a detailed explanation of its evidentiary ruling. Further, it is reasonable the court would consider defendant's search regarding child abuse investigations and parents who kill to be cumulative of

the items allowed in this case (the court allowed the search about how long a child death investigation takes and what is called when a parent is obsessed with thoughts of killing their child). Defendant's searches regarding "scary thoughts" and mental health, albeit relevant, were less specific as well as cumulative of the searches that were allowed (the court allowed the search about parents having thoughts of killing a child and specifically defendant searching "I've had thoughts about killing my kid"). The record before us does not reveal the trial court abused its discretion in denying admission of these Internet searches.

¶ 89          3. *Searches About Breastfeeding and Showing Access to Facebook and the Clock*

¶ 90          Last, the State argues the trial court should have allowed the Google search history showing searches conducted in November 2020 related to breastfeeding a six-year-old child and searches conducted on the night before N.B.'s death showing access to Facebook and use of the clock. The State contends these searches were relevant in establishing defendant's identity as the individual who conducted the searches on the cell phone.

¶ 91          The State does not argue these Google search history items are relevant to the criminal conduct charged in this case. Rather, the State contends they establish the foundation for the other Internet searches on defendant's cell phone. Yet, nothing in the record shows these three items listed in the Google search history actually identify defendant to establish such a foundation or justify reversal of the trial court's decision to deny their admission. The first item is listed in the motion *in limine* as "used Facebook" at 10:32 p.m. on February 16, 2021, but it does not indicate whose Facebook account was accessed on the cell phone. Likewise, a reference to "used clock" at 10:57 p.m. was purportedly on defendant's phone but does not establish defendant was the person who accessed the clock at that time. Finally, the search regarding

breastfeeding a six-year-old child was conducted in November 2020, but it does not identify defendant as the person conducting the search.

¶ 92    The trial court did allow four items enumerated in the motion *in limine* to be admitted into evidence but expressly stated their admission would be allowed "after proper foundation." If the State's method of laying a foundation for the searches allowed includes using other types of searches found on the cell phone, the court may be asked to revisit this matter. Notably, these three excluded searches may very well become relevant as rebuttal evidence if, as the trial proceedings progress, defendant challenges that this was, in fact, her cell phone. "When a trial court addresses a motion *in limine* that seeks to admit evidence rather than exclude it, events at trial may very well cause the court to reconsider its preliminary ruling." *People v. Drum*, 321 Ill. App. 3d 1005, 1008 (2001). However, at this stage of the proceedings, the court's ruling on these matters was not an abuse of discretion.

¶ 93                              B. Hearsay Statements

¶ 94    The State argues the trial court abused its discretion in denying admission of all hearsay statements made by N.B. to Rhonda and Emma and some statements N.B. made to Rebecca and Daniel.

¶ 95                              1. *Applicable Law*

¶ 96    Hearsay is an out-of-court statement offered to establish the truth of the matter asserted. *People v. Tenney*, 205 Ill. 2d 411, 432-33 (2002). Such statements are inadmissible unless an exception applies. Ill. R. Evid. 802 (eff. Jan. 1, 2011). Section 115-10.2a(a) of the Code establishes a hearsay exception in domestic violence prosecutions for statements made by protected persons, which include, *inter alia*, any person abused by a family or household member. 725 ILCS 5/115-10.2a(a) (West 2022) (referencing section 201 of the Illinois Domestic

Violence Act of 1986 (750 ILCS 60/201(a) (West 2022)), defining protected persons). Specifically, section 115-10.2a(a) provides that a statement made by these individuals

"not specifically covered by any other hearsay exception but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule if the declarant is identified as unavailable as defined in subsection (c) and if the court determines that:

(1) the statement is offered as evidence of a material fact; and

(2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) the general purpose of this Section and the interests of justice will best be served by admission of the statement into evidence." 725 ILCS 5/115-10.2a(a) (West 2022).

Subsection (c) of the Code (*id.* § 115-10.2a(c)), includes six circumstances when a declarant is considered "unavailable." Although not specifically listed, death renders a declarant "unavailable" under this provision of the Code. *People v. Granados*, 2024 IL App (3d) 220035-U, ¶ 47; see *Richter*, 2012 IL App (4th) 101025, ¶¶ 86-93; *People v. Cleary*, 2013 IL App (3d) 110610, ¶ 31.

¶ 97   In *Richter*, 2012 IL App (4th) 101025, ¶¶ 99-104, this court considered the approach trial courts should use to determine whether proffered hearsay statements possess circumstantial guarantees of trustworthiness under section 115-10.2a the Code. We concluded the factors implemented by the trial court in that case, derived in part from *People v. Smith*, 333

Ill. App. 3d 622, 635 (2002), were useful in this regard. *Richter*, 2012 IL App (4th) 101025, ¶ 99. Those factors included:

> "(1) what motivation the specific witness might have to testify, (2) whether the statements were subject to cross-examination, (3) whether the statements were based on [the witness's] personal knowledge, (4) the spontaneity of the statements, (5) the lack of motive to fabricate the statements, (6) whether there was consistent repetition, (7) whether [the witness] was under duress or pressure when [he or] she made the statements, (8) whether [the witness] recanted or reaffirmed [his or] her statements, (9) whether the statements were made in response to leading questions, (10) the time that elapsed between each incident and [the witness's] statements about that incident to others, and (11) the existence of any reliable evidence that refuted [the witness's] statements." *Id.* ¶ 48.

We likewise concluded similar factors outlined in *People v. Thomas*, 313 Ill. App. 3d 998, 1005-06 (2000), remained useful in making the determination of trustworthiness under the Code. *Richter*, 2012 IL App (4th) 101025, ¶¶ 103-04.

¶ 98    It bears repeating that a trial court's decision on a motion *in limine* regarding the introduction or exclusion of evidence, including its consideration of hearsay evidence, is reviewed under an abuse of discretion standard. *Id.* ¶ 97.

¶ 99                    2. *Denial of Hearsay Testimony*

¶ 100    It is undisputed the statements made by N.B. to various witnesses about his mother's abusive conduct invoke the hearsay exception set forth in section 115-10.2a of the Code. Defendant's prosecution for the first degree murder of her child meets the definition of a

"domestic violence prosecution." Further, N.B. was a person abused by defendant who was a family member, and N.B. was unavailable to testify.

¶ 101    The State asserts the trial court improperly evaluated the trustworthiness of the statements, thereby incorrectly concluding all statements made by N.B. to Rhonda and Emma, as well as several statements made to Rebecca and Daniel, were inadmissible. The State contends, considering the factors relevant to assessing the trustworthiness of the excluded statements, the court's decision was an abuse of discretion and unduly restricted the State's ability to present its case to the jury in a manner that was unreasonable and arbitrary.

¶ 102    a. Denial of Rhonda's and Emma's Testimony Regarding N.B.'s Hearsay
         Statements Regarding the Attempted Drowning and Suffocation Incidents

¶ 103    The State contends Rhonda's and Emma's testimony regarding the statements N.B. made to them about the attempted drowning and suffocation incidents met all the criteria set forth in section 115-10.2a of the Code, most notably, the statements possessed circumstantial guarantees of trustworthiness as contemplated by *Richter*. The State argues further their testimony should not be considered unnecessarily cumulative; rather, it is essential to show consistency in N.B.'s disclosures of abuse at the hands of defendant. As such, the trial court abused its discretion in denying its admission. We agree.

¶ 104    The record shows N.B.'s statements to Rhonda and Emma were based on his own personal knowledge, experiences, and interactions with defendant. Although not subject to cross-examination, N.B. shared what he endured with people whom he presumably trusted and who were close to him, including his grandmother (Rhonda) and 15-year-old aunt (Emma). N.B. described in consistent detail to both Rhonda and Emma the attempted drowning and attempted suffocation incidents he endured at the hands of defendant. There is nothing in the record to

suggest these statements were made under duress or in response to leading questions; instead, they were spontaneously made. Emma testified N.B. initiated the conversations about the incidents, explaining two occasions when he brought them up while they played video games or watched television together. Similarly, Rhonda testified N.B. initiated the conversations; notably, she stated N.B. told her about a suffocation attempt "out of the blue." Although both Rhonda and Emma testified they asked follow-up questions during their conversations with N.B., the testimony supports the conclusion N.B. was not being prompted or guided in sharing his experiences.

¶ 105    Although N.B. stated he did not like living with defendant, he explained it was because of the abuse and his fear of continued abuse. There is nothing to suggest N.B. was motivated to fabricate the statements. Likewise, there is no reliable evidence presented to refute his statements or to suggest he ever recanted them. On the contrary, N.B., a seven-year-old boy, shared with multiple people consistent and repeated accounts of the abuse he endured at the hands of defendant, and he even expressed his fear she would someday end his life.

¶ 106    The record shows the testimony of Rhonda and Emma regarding the attempted drowning and attempted suffocation incidents met the criteria for the hearsay exception set forth in section 115-10.2a(a) of the Code. In particular, the statements were offered as evidence of a material fact and possessed circumstantial guarantees of trustworthiness as contemplated by *Richter*. See 725 ILCS 5/115-10.2a(a)(1) (West 2022). The statements are more probative on the point for which they are offered, to show consistency in N.B.'s claims of abuse at the hands of defendant, than other potential evidence (*id.* § 115-10.2a(a)(2)), and the interests of justice will best be served by admission of the statements into evidence (*id.* § 115-10.2a(a)(3)).

¶ 107       We state again, a court may also exclude relevant evidence if "its probative value

is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation

of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). However, none of these concerns

are present in this case. By allowing N.B.'s hearsay statements made to Rebecca and Daniel, the

trial court presumably determined the probative value of those statements was not substantially

outweighed by any prejudicial effect. Likewise, the statements did not pose a risk of confusion or

misleading the jury. We see no reason to come to a different conclusion regarding the same

hearsay statements made to Rhonda and Emma.

¶ 108       The last consideration that could support a decision to exclude this evidence is

whether it could be deemed needlessly cumulative of other properly admitted evidence. The

testimony of Rhonda and Emma about N.B.'s hearsay statements concerning the attempted

drowning and suffocation incidents will be cumulative to the testimony of Rebecca and Daniel.

Though cumulative, the evidence is not *needlessly* cumulative in this case. Rather, it will be key

in showing consistency in N.B.'s disclosures of abuse at the hands of defendant and supports the

State's theory of the case regarding defendant's intent, preparation, plan, knowledge, and

absence of mistake or accident in ending N.B.'s life. To the extent the trial court considered the

evidence inadmissible under section 115-10.2a of the Code or because it would result in the

needless presentation of cumulative evidence, we find the decision to exclude Rhonda's and

Emma's testimony regarding N.B.'s statements regarding the attempted drowning and

suffocation incidents was an abuse of discretion.

¶ 109       b. Denial of Rhonda's and Emma's Testimony Regarding N.B.'s Hearsay

Statements on Other Matters

¶ 110        In its motion *in limine*, the State listed several additional hearsay statements made by N.B. to Rhonda and Emma that were deemed inadmissible. These include statements N.B. made to Rhonda about (1) defendant being the cause of bruises she noticed on his back during a visit, (2) not liking to go home because defendant is mean, and (3) defendant giving N.B. melatonin to make him sleep. Although the State argued all of Rhonda's testimony should have been admitted, the State did not specifically address these statements in its brief. Further, the State did not address N.B.'s statement to Emma that defendant told N.B. she hated him because she had four miscarriages. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) provides that "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." As such, the State has forfeited any argument the trial court abused its discretion in finding these statements inadmissible.

¶ 111        c. Denial of Rebecca's and Daniel's Testimony Regarding N.B.'s Hearsay

Statements

¶ 112        The State acknowledges the trial court's ruling on the motions *in limine* allowed most of the hearsay statements N.B. made to Rebecca and Daniel. The State contends the court abused its discretion by "arbitrarily and unreasonably" excluding a number of other the statements "without reason or explanation." We agree.

¶ 113        Rebecca's and Daniel's testimony about N.B.'s statements describing the attempted drowning incident, the attempted suffocation incident, and the slapping incident in the car were deemed admissible. However, the trial court specifically found the following three statements N.B. made to Rebecca and Daniel inadmissible: (1) "August 2018: N.B. said that Defendant chokes him," (2) "May 2020: N.B. told the Rheas that Defendant hurts him and she told him not to tell anyone else or she will hurt him," and (3) "June 2020: N.B. told them that

Defendant smothered him with a pillow until he couldn't breathe." Upon comparing the admitted statements with those that were not, this court cannot discern why the trial court excluded these particular statements after admitting the others.

¶ 114　　　　The trial court allowed an undated statement under the heading "2018-2021 statements" wherein "N.B. told Rebecca that when defendant wakes him up in the morning, she puts her hands on his neck and chokes him." However, the court did not allow the following statement listed under the same heading in the motion *in limine*: "August 2018: N.B. said that Defendant chokes him." We find it similarly confounding the court allowed the following statement described in the motion *in limine*: "June 2020: N.B. said that Defendant sat on him with a pillow and laughed," but it did not allow "June 2020: N.B. told them that Defendant smothered him with a pillow until he couldn't breathe." The record reveals Rebecca testified in detail about this incident. She stated, in the summer of 2020, N.B. told her about an incident where he was playing with cars on the couch and defendant threw the couch cushion on top of him, sat on it, and would not get up. She testified N.B. "said he couldn't breathe." Finally, the court did not allow admission of the hearsay statement described in the motion as follows: "May 2020: N.B. told the Rheas that Defendant hurts him and she told him not to tell anyone else or she will hurt him," but N.B. was shown in the living room video making this statement to Daniel while Rebecca recorded.

¶ 115　　　　Without explanation, the trial court allowed most of the hearsay statement N.B. made to Rebecca and Daniel and excluded only the three statements referenced herein. After reviewing the record, we conclude the trial court's decision as to those three hearsay statements was arbitrary and an abuse of discretion.

¶ 116　　　　　　　　　C. Video Recordings of N.B.

¶ 117          Last, the State claims the trial court "arbitrarily and unreasonably excluded" the two video recordings of N.B. describing separate instances of abuse. In the car video, N.B. described to Rebecca an incident where defendant attempted to drown him in the bathtub. In the living room video, N.B. describes to Daniel an incident where defendant stopped the car, got out, and slapped and punched him while he was in the back seat. However, the State makes only a conclusory argument and has failed to cite any relevant authority supporting its theory that the jury should be allowed to view the videos of the now deceased victim describing in fairly general terms the incidents while being asked questions eliciting his responses. Although Rebecca and Daniel may have been trusted adults to N.B., the record does not indicate that they have experience or training in interviewing child abuse victims. Furthermore, both videos are brief and begin while N.B. is in mid-conversation and is asked to repeat things he had presumably said before the video began. In its reply brief, the State contends, "[T]he trial court's order nevertheless prevents the jury from being able to see the victim's disclosures, evaluate the circumstances surrounding each of the disclosures, and perhaps most importantly, assess the victim's credibility." Yet, the State cites no authority to provide a legal basis for this contention.

¶ 118          Rule 341(h)(7) requires an appellant to adequately develop his or her argument with citation of relevant authority. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). It is a long-established principle that the appellate court "is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research." *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993). Failure to comply with Rule 341(h)(7) may result in forfeiture. *People v. Rosalez*, 2021 IL App (2d) 200086, ¶ 170.

¶ 119    Forfeiture aside, the trial court's decision to exclude the videos was not an abuse of discretion. The hearsay statements N.B. made in the videos describing the attempted drowning incident and slapping incident that occurred in the car were allowed to be admitted by the court via the testimony of Rebecca and Daniel. The State acknowledges in its reply brief it was "still permitted to provide hearsay evidence of the occurrence of the two acts of abuse." The State contends this is insufficient and the jurors should be allowed to see the victim to judge for themselves the credibility of N.B.'s claims of abuse. However, even relevant evidence can be excluded if its prejudicial effect substantially outweighs its probative value. Ill. R. Evid. 403 (eff. Jan. 1, 2011). We determine the trial court's decision to exclude the videos, especially given the incidents N.B. described in the videos would be admitted via the testimony of Rebecca and Daniel, was not arbitrary, fanciful, or unreasonable, or such that no reasonable person would take the court's view. See *Starks*, 2012 IL App (2d) 110273, ¶ 20.

¶ 120                              III. CONCLUSION

¶ 121    For the reasons stated, we affirm in part and reverse in part the trial court's judgment.

¶ 122    Affirmed in part and reversed in part.

*People v. Safranek*, 2025 IL App (4th) 240967

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Ogle County, No. 21-CF-91; the Hon. John C. Redington, Judge, presiding. |
| **Attorneys for Appellant:** | Michael C. Rock, State's Attorney, of Oregon (Patrick Delfino, David J. Robinson, and James Ryan Williams, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| **Attorneys for Appellee:** | James E. Chadd, Catherine K. Hart, and Edward J. Wittrig, of State Appellate Defender's Office, of Springfield, for appellee. |